[File No. 6553.]

ETHEL M. BEKKEN, Administratrix of the Estate of Oscar H. Bekken, Deceased, Respondent, v. THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, a Foreign Corporation, Appellant.

(293 N. W. 200.)

Opinion filed May 16, 1940.

*Pierce, Tenneson, Cupler & Stambaugh,* for appellant.
*J. A. Coffey,* for respondent.

CHRISTIANSON, J.   The plaintiff is the widow of Oscar H. Bekken, and the administratrix of his estate.   Bekken was killed in an automobile accident on June 26th, 1934, without any fault on his part. On June 1st preceding his death, he had made written application to the defendant for insurance on his life in the sum of $2,000 payable to his wife, the plaintiff; but the defendant failed to accept or to reject the application, and, in this action, plaintiff seeks to recover from the defendant damages in the amount of $2,000.

In the complaint it is alleged that the plaintiff is the administratrix of the estate of Oscar H. Bekken, deceased; that the defendant is a foreign corporation authorized to do life insurance business in North Dakota; that during the month of April, 1933, Oscar H. Bekken applied to the defendant, through its agent Sundahl, for insurance upon his life in the sum of $2,000; that he was examined by the defendant's physicians and found to be in good health and was approved and accepted as an insurable risk and that defendant thereupon issued an ordinary life policy taking effect May 3d, 1935, preceded by a two-year term policy taking effect May 3d, 1933, and continuing in force upon the payment of premiums until the ordinary life insurance policy became effective May 3d, 1935; that the said two-year term policy was put into effect but that about the first of the year 1934 it was declared lapsed by the defendant company for nonpayment of premiums; that soon after said Bekken became aware that said policy had lapsed he applied to the defendant company for reinstatement or for a new policy and that on or about June 1st, 1934, at the instance and upon the advice of said defendant's agent he made application for a new policy; that said application was prepared by Sundahl, said agent of said defendant company, and contained the following provision: "I have paid to Halvor H. Sundahl (the soliciting agent for defendant) $8.26 to cover the first quarterly premium on the policy applied for above, in accordance with the provisions of the receipt of date and number corresponding to this application, which I hereby accept, and agree to the

conditions thereof;" that the receipt referred to in said application was as follows:

"No. Q.570294

"Received of Oscar H. Bekken Eight & $^{26}/_{100}$ dollars, the first quarter annual premium on proposed insurance for $2000. T-5 on the life of ———— for which Part I of an application bearing a corresponding number as above is this day made to the Equitable Life Assurance Society of the United States. Insurance, subject to the terms and conditions of the policy contract, shall take effect as of the date of this receipt, provided satisfactory Part II of the application is furnished to the Society and provided the applicant is on this date in the opinion of the Society's authorized officers in New York, an insurable risk under its rules and the application is otherwise acceptable on the plan and for the amount and at the rate of premium applied for; otherwise the payment evidenced by this receipt shall be returned on demand and the surrender of this receipt.

"Dated at Jamestown, N. D. 6/1/1934. Halvor Sundahl, Agent.·

"This receipt must not be detached unless first premium is collected."

That as a part of the said application there was a statement entitled "Agent's certificate as to insurability of applicant" that was executed by the said agent Sundahl to the effect that he had personally solicited and secured the application and that he knew of nothing against the risk which was not fully set forth in the application papers. That the application that was made on or about June 1st, 1934, was submitted with the knowledge that there was no material change in the condition of applicant's health since he had been approved as an insurable risk and policy issued to him in May, 1933; that the acts and conduct·of the defendant company and its agent led applicant to believe, and justified him in believing, that his insurability as a risk had been established and that the representations of the agent of the defendant led him to believe that he was an insurable risk under the rules, examination, and investigation of defendant company and that as a consequence he was induced and influenced to·forego seeking insurance with other companies. That during the month of June, 1934, and from June 1st to June 26th, the applicant Bekken was in good health and an insurable risk and that his physical condition had undergone no change prejudicial to his acceptance as a risk since his examination and accept-

ance by the defendant as an insurable risk in May 1933. That Bekken, at the time of executing the application, on June 1st, 1934, made settlement and payment of the premium fixed and required in accordance with the demand of the agent of the defendant and that applicant complied with all the directions and requirements of the company and its agent in connection with the application, but that the defendant, after receiving the application, was dilatory and negligent in having a physical examination made and in forwarding the report to the head office of the company and in acting upon said application. That applicant was instantly killed in an automobile accident on June 26th, 1934, without any fault on his part; that if the defendant company had acted upon the application within a reasonable time, the applicant would have been found to be an insurable risk, the policy would have been issued and in force at the time of his death, but that the defendant was negligent and dilatory and failed to act upon the same within reasonable time as required by law. That the plaintiff is the widow of Oscar H. Bekken, and that her name "was inserted and appeared in the application as beneficiary," and that she would have been the beneficiary in the policy had the company acted in timely manner and issued the policy.

The defendant demurred to the complaint on the grounds:—

(1) "that the court has no jurisdiction over the person of the defendant or the subject of the action," and,

. (2) "that the complaint does not state facts sufficient to constitute cause for action."

The demurrer was overruled, and the defendant interposed an answer.

In the answer it is denied that the defendant was negligent and that there was any undue delay on its part in any action required by it; and it is alleged that if there were any unreasonable delay, the same was occasioned by the negligence of said Bekken. It is alleged in the answer that said Bekken, in April, 1933, applied to the defendant for a policy of insurance upon his life, payable to Ethel M. Bekken, his wife, in the sum of $2,000 upon the five-year term salary savings plan; that upon consideration of said application and the medical examiner's report, the defendant declined to issue the policy applied for, it being the opinion of the authorized officers of the company that the appli-

cant was not an insurable risk on that plan for the reason that he was overweight and engaged in an occupation considered by the defendant to be hazardous; but, that the defendant offered to issue to Bekken a policy of insurance upon a different plan, known as an ordinary life policy, preceded by a two-year term policy; that said Bekken thereupon executed a further application for the types of policies which the defendant so offered to issue, and that thereupon such policies were issued, and that the two-year term policy remained in force until November 3d, 1933, when it was lapsed for nonpayment of premiums. It is further alleged in the answer that in the application made by him in April, 1933, in answer to an interrogatory concerning the extent to which he used intoxicating liquors, Bekken said: "Beer—small amounts—rarely;" and that he further stated that he had not been intoxicated during the preceding five years; and it is alleged that the policies were issued in reliance upon such answers by Bekken, and that the defendant "had no knowledge of the falsity of the same," and that the report from the medical examiner and the inspection report obtained by the defendant regarding the character, habits and reputation of said Bekken did not disclose that "the said Oscar H. Bekken was continually addicted to the use of alcoholic beverages and was intemperate in the use thereof."

It is further alleged in the answer that on June 1st, 1934, Bekken applied to the defendant for a policy of insurance upon his life in the sum of $2,000 upon the five-year term plan, in which application Ethel M. Bekken, his wife, was named as the proposed beneficiary; that said application was taken by Halvor Sundahl, the soliciting agent of the defendant at Jamestown, North Dakota, who thereupon signed the receipt which has been set forth above; that the quarterly premium referred to in said receipt was not paid to Sundahl in cash, but that Bekken executed and delivered to Sundahl his promissory note for the amount of such premium; that at the time the application was signed, Bekken was informed by Sundahl that before the application could be considered it was necessary that he be examined by the examining physician for the defendant at Jamestown; that although requested to appear for said examination, Bekken failed to do so until June 12th, 1934; that in the application signed by Bekken he stated that he used a small amount of alcoholic beverages and that he had been intoxi-

cated within the last five years; and that in the report made by the examining physician it was stated that Bekken "drinks quite heavily at intervals." That the application was promptly transmitted in the usual and customary manner, and it appearing from the application and report that Bekken was addicted to the use of alcoholic beverages, the defendant, in accordance with its established practice, instituted an investigation as to the insured's use of alcoholic beverages, and that while such investigation was being made, Bekken was killed in an accident which occurred June 26th, 1934. That notwithstanding the death of said Bekken the defendant continued its consideration of the application and on July 2d, 1934, declined the same, on the ground and for the reason that said Bekken was not an insurable risk; and that the defendant thereupon tendered to the plaintiff the promissory note given for the first quarterly premium.

A reply was not necessary, as the new matter set forth in the answer was "deemed controverted by the adverse party as upon a direct denial or avoidance." Comp. Laws 1913, §§ 7452, 7467–7477; Moores v. Tomlinson, 33 N. D. 638, 157 N. W. 685.

The case was tried to a jury and resulted in a verdict in favor of the plaintiff for $2,000 and interest. The defendant moved in the alternative for judgment notwithstanding the verdict or for a new trial. The motion was denied and the defendant has appealed from the judgment and from the order denying the motion for judgment or for a new trial.

Appellant contends:

(1) That the complaint does not state facts sufficient to constitute a cause of action;

(2) That the evidence does not establish any actionable negligence or other breach of duty on the part of the defendant in acting upon the application for insurance;

(3) That in any event, if a cause of action is set forth in the complaint and established by the evidence, the cause of action is one for a tort and did not survive the death of Bekken;

(4) That it is not established that the applicant could have secured insurance of the same kind and character as that applied for, or insurance on any plan, from any other life insurance company in

the event the defendant had rejected the application, and that consequently there is no proof of damage;

(5) That in any view the damages awarded are excessive as there was no proof that the estate of the deceased has been damaged in any amount by the failure of the defendant to act upon the application;

(6) That the receipt issued did not constitute a contract for temporary insurance;

(7) That if such receipt created a temporary contract for insurance, that the cause of action upon such contract vested in the beneficiary named in the application and not in the personal representative of the deceased applicant.

These several contentions are interrelated, and they will be considered together in light of the evidence and pertinent legal principles.

The defendant is a foreign life insurance company having its home office in the City of New York, and was authorized to carry on its business in this State during the time involved in this controversy. The laws of this State provide that it shall be unlawful for any person to solicit insurance on behalf of any insurance corporation or to transmit an application for a policy of insurance, other than for himself, to or from an insurance corporation, or to collect any premiums for insurance unless the person who engages in such activities has obtained a certificate of authorization from the Commissioner of Insurance. (Comp. Laws 1913, §§ 4959, 4960, 4920); and that any person who is so authorized and who engages in any such activity for any insurance company "shall be held to be an agent of such corporation to all intents and purposes, unless it can be shown that he receives no compensation for such services." § 4959, supra. During the time involved in this controversy one Halvor Sundahl was the duly authorized agent of the defendant at Jamestown and, acting as such, represented the defendant in the transaction which gave rise to this controversy.

On April 3d, 1933, Oscar H. Bekken made application to the defendant for a policy of insurance upon his life in the amount of $2,000 upon the five-year term salary savings plan. Ethel M. Bekken, the applicant's wife was designated as beneficiary. The defendant did not issue the policy applied for, but offered instead a policy on the ordinary life plan to become effective May 3d, 1935, preceded by in-

surance on a two-year term basis. This policy was accepted by the applicant. The policy provided for payment of a monthly premium of $2.52 during the continuance of the two-year term agreement. The applicant did not pay the premium which fell due November 3d, 1933, and as a result the policy lapsed. Thereafter, Bekken and the soliciting agent, Sundahl, discussed the matter of reinstatement of the lapsed policy. Sundahl testified that he and Bekken talked about the matter on several occasions,—that Bekken was pressed for money and that he made application for a new policy "because it would be impossible to reinstate the old one owing to the fact that he didn't have the money to make up the back payments." (On June 1st, the accumulated payments on the lapsed policy, including payment for the month of June, aggregated $20.16, and the quarterly premium on the new policy applied for amounted to $8.26.) On June 1st, 1934, Bekken executed, and Sundahl received, the application which gave rise to this action. The application was made on a printed blank provided by the defendant, and the answers therein were written by the soliciting agent, Sundahl.' The application named Ethel M. Bekken, the applicant's wife, as beneficiary, and asked that the policy be on the "five-year term plan, with premiums of $8.26 payable quarterly," and continued with a statement to the effect that the applicant had paid to Sundahl (defendant's agent) "$8.26 to cover the first quarterly premium on the policy applied for above, in accordance with the provisions of the receipt of date and number corresponding to this application, which I hereby accept, and agree to the conditions thereof." There was attached to the printed application a blank form of the receipt referred to in the application. On the same day the application was signed by Bekken, the agent, Sundahl, executed the receipt attached to the application, which receipt was set forth in the complaint, and has been quoted above. On the reverse side of the application there was a printed blank entitled *"Agent's certificate as to insurability of applicant."* This certificate contains thirteen interrogatories relating to the applicant, such as his financial standing, physical condition, habits, the length of time the applicant has been known to the agent, whether there are other applications for insurance pending, and other questions relating to the reason for the making of the particular application.

Immediately above the line provided for the soliciting agent's signature is this statement: "I hereby certify that I personally solicited and secured this application, and I know of nothing against the risk which is not fully set forth in these papers."

Immediately below the soliciting agent's signature is the following statement in large type: "Note: Failure to fill out and sign the foregoing Agent's certificate properly will delay action at the Home Office until the opinion of the Agent regarding the desirability of the risk shall have been received." This certificate was signed by the soliciting agent, and the several inquiries were answered consistently with the statement in the certificate.

Apparently some discussion was had between Bekken and Sundahl concerning the matter before the application was signed. Sundahl testified: "I told Mr. Bekken that in making this new application that he would have to submit himself to a medical examination, because the policy had been lapsed too long. . . . I don't know, I can't recall just exactly what was said, but probably I did tell him that I didn't think there was any question but what he could pass the medical examination, because he had a policy so recently, but I never promise anyone whether they can be accepted for insurance, because a person's health can change in a week's time.

"Q. You did discuss that question of his recent insurance?

"A. I wouldn't say that I did, but probably I might have said that. There is no guarantee that he could get a policy, but I did say he had had a policy so recently, probably there wasn't any change."

Sundahl, the soliciting agent, directed Bekken to call at the office of Dr. DePuy at Jamestown for the medical examination required in connection with the application. The medical examination was made on June 12th, 1934, and on the evening of June 13th the application, together with the medical examiner's report, was forwarded by the soliciting agent at Jamestown to the office of the district manager of the defendant at Fargo. The application and the papers incident thereto were checked for discrepancies and errors in such district manager's office, and were apparently found to be satisfactory as they were forwarded to the defendant's office at Minneapolis, Minnesota, where they were received on June 16th, 1934. When the papers were checked there by an "abstractor and inspector of medicals" a discrepancy was

found concerning the date of the applicant's birth. The application gave the date of birth as August 26th, 1889, and the medical examiner's report gave the date of birth as August 22nd, 1889,—or a difference of four days. Thereupon, a letter was written to the soliciting agent at Jamestown directing him to obtain the signature of the applicant to a certificate showing the correct date of birth. Such certificate was received at the cashier's office in Minneapolis June 20th, 1934. Thereafter, the cashier's office forwarded the papers in connection with the application to the home office of the defendant in New York City on that same day. According to the practice of the company, it was the duty of the cashier's office at Minneapolis to initiate an investigation as to the character, habits, etc., of the applicant. This investigation was made by a local inspector, appointed and compensated by the defendant, who was furnished with appropriate blanks on which to make such report to the district inspector's office at St. Paul, Minnesota. The cashier's office forwarded the appropriate request to the local inspector at Jamestown on June 20th. The local inspector forwarded his report to the district office on the day following. In such report it was said that Bekken became intoxicated once or twice a month—"25 times a year." It was, also, said: "Inquiry discloses that this man has been indulging in drink as often as once a month for several years. . . Has worked in Jamestown during the past four or five years and seems to change firms often said to be due to his periodic sprees and its effect on business produced by him."

After receiving this report, the district inspector requested the local inspector at Jamestown to furnish further information. In compliance with such request, the local inspector sent a supplemental report, which reads as follows:

"6-25-34

"Remarks:—

"I find that this man was let out as Studebaker salesman because of too frequent use of liquor last March—then became intoxicated about twice a month, and I am told that he still over-indulges in liquor about every two or three months. His last intoxication I am told occurred about two weeks ago.

"6–26–34

"This morning find that Mr. Bekken was killed in an auto accident.
"E. N. Johnson.
"6–26–34

"Mr. Bekken was killed in auto accident last night. Got this report as I was about to drop report in mail."

This supplemental report was received at the district office on June 27th, and was forwarded by the district inspector to the home office on that same day.

In the meantime, the papers incident to the application had been received at the home office on June 22d. The medical examination had been reviewed and the case rated,—being given the same rating as that given on the previous application in April, 1933. The papers had been considered by the medical supervisor, and passed on to the underwriting department, and were considered by the Chief Lay Underwriter on June 25th, who then made an indorsement, "await inspection report." The medical supervisor, as well as the lay underwriters, testified that under the rules of the defendant company the occupation of automobile salesmen was deemed a hazardous one, rendering one engaged in such work a prohibited risk under the five-year term plan. The medical supervisor further testified that the revision department had authority to offer to an automobile salesman, who applies for a five-year term policy, an ordinary life preceded by a two-year term, in place of the policy applied for.

On June 30th, Bekken's application, together with the two inspection reports, were passed on to the then associate medical director (the present medical director), who had authority to approve or decline the application. He testified that in his opinion Bekken was not an insurable risk on any plan, because of his use of intoxicants. On July 2d, he disapproved Bekken's application. He testified that this decision was not affected by Bekken's death. During the course of his examination, the medical director testified as follows:

"Q. So that any investigation that you might have made after you knew that the applicant was dead would be of no effect one way or the other, would it, Doctor?

"A. Yes, it would: in this case.

•     •     •     •     •     •     •     •     •     •

"Q. The company also expects its soliciting agent, does it not, to forward the papers to the home office as expeditiously as possible? A. Yes, sir.

"Q. Of course, that is all taken into account when you figure up the reasonability of the time to act upon these applications?

"A. We do not figure up any reasonability of time. We usually allow a period of sixty days from the date of the examination to allow the delivery of the policy.

"Q. For the delivery of the policy? A. Yes, sir.

"Q. That is even true, though you have the man's premium paid in advance, isn't it, Doctor?

"A. The policy is paid for, then. It does not make any difference.

"Q. It is the practice of the company, isn't it, Doctor, to have the insured pay his premium when the application is made?

"A. The company tries to get that done. It is their desire.

. . . . . . . . . .

"Q. Doctor, assuming that an applicant makes an application for insurance to The Equitable Life Assurance Society, that he pays his premium, and The Equitable Life Assurance Society takes a certain length of time to pass upon that application, and they pass upon it favorably, they date the policy back to the time of the application, do they not?

"A. This policy is dated as of the day he pays for it.

"Q. That would be— ? A. On June 1st.

"Q. On June 1: When he made his application?

"A. Yes. That is, cases that are paid on binder. . . .

"Q. What is the purpose, Doctor, then, of The Equitable Life Assurance Society making it a practice to have the applicant pay the premium to their agent at the time the application is made?

"A. So as to have the man covered by insurance immediately.

"Q. In other words, the company considers, does it not, that the applicant is covered by insurance immediately when he pays the premium and makes his application?

"A. If he is insurable at that time according to the medical examination, inspection, and so forth.

. . . . . . . . . .

"Q. Would not that be tantamount to unfair dealing—well, put

it that way—for a life insurance company to accept a man's premium at the time he makes his application, and to keep him in suspense until they deem it proper, within their opinion, to pass upon his insurability? . . .

"A. No. We pay death claims sometimes where a man dies before we get the papers: we pay them right along."

Evidence was adduced by plaintiff tending to show that Bekken was an insurable risk at the time of his application for insurance and from then to the time of his death; also, to show that the statements in the reports of the local inspector regarding Bekken's use of intoxicants, and his discharge from employment on account thereof were untrue. The defendant called as a witness, Johnson, the local inspector who made the reports mentioned above. On his direct examination Johnson testified that he answered the questions in the report "to the best of my ability after making a casual inquiry around town, business men, different places, people apt to know the applicant." On cross-examination he stated that his statements in the supplementary report were a summary of the information gathered from "possibly a dozen different sources;" but that he could not recall and give the name of any persons from whom he had received the information. He stated, however, that he had not talked with the dealer in whose employ Bekken was at the time of his death,—in whose employ he had been for several years. The following question was asked, and the following answer given during such cross-examination:

"Q. Who did you get the information from that he was discharged from his employment?

"A. I cannot recall, there were several people I talked to, and I don't know who they were."

Johnson testified that he had talked with Lippert, the Studebaker dealer at Jamestown, and that "the inference" from what Lippert told him was that Bekken had been discharged because of "intoxication and drink." Lippert, the Studebaker dealer, was later called as a witness by plaintiff, and gave the following testimony:

"Q. Mr. Johnson testified here yesterday that he had interviewed you. I will ask you to state to this Court and Jury whether or not

you told Mr. Johnson that you had discharged Mr. Bekken because of drink?

"A. No, Mr. Johnson tried to have me make that statement, but I refused, because I couldn't.

"Q. That wasn't true. A. No."

On cross-examination Johnson, also, testified that in April, 1933, he was the office manager of defendant's then local inspector—reporting on applicants from Jamestown, and that the report on Bekken's application for insurance in April 1933, was in his (Johnson's) handwriting; that he furnished the information on which it was based, and that he signed the name of the then local inspector to such report pursuant to his authorization. In the report so made in April, 1933, all questions relating to whether applicant used intoxicating liquors in excessive quantities, or whether he then did, or in the past had, "drunk to intoxication," were answered in the negative; and there was inserted in the report this statement:

"Known by my office manager—past health good—good repute and standing. Good appearing and fine personality. Well liked in community." Johnson admitted that this statement was in his handwriting, had been written by him, and that the term "office manager" referred to himself.

Insurance is a contract, which, like other contracts, results only from an offer and an acceptance of the offer. There is a conflict in the authorities as to whether legal obligations arise only after a contract of insurance has been made, or whether in certain circumstances a legal duty arises, from the relationship created during the negotiations between an applicant for insurance and the insurance company, to act promptly upon the application, and to inform the applicant whether the offer is accepted or rejected. Generally speaking, there are two main lines of decisions dealing with these questions. According to one view, the legal relations between an applicant and the insurance company "are fundamentally the same as those between parties negotiating any other contract, and are 'purely contractual;' " that "mere delay, mere inaction by an insurance company in passing on an application does not constitute an acceptance or establish the relationship of insurer and insured," and that such delay or inaction does not constitute any breach of duty by the insurance company. Thornton v. Na-

tional Council, J. O. U. A. M. 110 W. Va. 412, 158 S. E. 507. According to this view, no duty arises unless, and until, a contract has been created; if there is no contract, there is no duty, and consequently there is no liability on the part of the insurer because of any delay or inaction on its part in passing upon the application, or in issuing or delivering the policy. "The applicant and the insurer are treated as if the negotiations were of ordinary bargain and sale, in a field where both stand on the same footing. The applicant frames and signs, upon his own judgment and at his own risk, an order or request for an article called a policy. This order is taken and transmitted by an intermediary commissioned, equipped and paid by the insurer, but the insurer may by mere words" so limit and restrict the effect that naturally would be given to the acts of such intermediary that the practical result is to almost "destroy the relation of agency between itself and the intermediary, and cast all the consequences of his mistakes and misfeasances upon the applicant. Upon receipt of the order, the insurer fills it by forwarding an elaborate and intricate document, which the applicant takes according to the rule of caveat emptor. If the terms of the policy do not correspond to the application, a new proposition is tendered, which the applicant must detect, scrutinize, and reject, or forever hold his peace. At every step the applicant is held vigorously to the maxim, 'Vigilantibus et non dormientibus jura subveniunt.' Meanwhile the insurer has the applicant's money." Pfiester v. Missouri State L. Ins. Co. 85 Kan. 97, 116 P. 245; Security Ins. Co. v. Cameron, 85 Okla. 171, 205 P. 151, 27 A.L.R. 444. See Savage v. Prudential L. Ins. Co. 154 Miss. 89, 121 So. 487; Metropolitan L. Ins. Co. v. Brady, 95 Ind. App. 564, 174 N. E. 99; Schliep v. Commercial Casualty Ins. Co. 191 Minn. 479, 254 N. W. 618.

The other line of decisions holds that an insurance company that has solicited and received a completed application for insurance is under a legal duty to take prompt action on the application, and give prompt notice to the applicant of its action; and that consequently such insurance company is liable in tort for negligent delay in acting upon the application, and notifying the applicant in case the application is rejected. Carter v. Manhattan L. Ins. Co. 11 Haw. 69; Boyer v. State Farmers' Mut. Hail Ins. Co. '86 Kan. 442, 121 P. 329, 40 L.R.A. (N.S.) 164, Ann. Cas. 1915A 671; Duffie v. Bankers' Life Asso. 160

Iowa 19, 139 N. W. 1087, 46 L.R.A.(N.S.) 25; Dyer v. Missouri State L. Ins. Co. 132 Wash. 378, 232 P. 346; Stearns v. Merchants' Life & Casualty Co. 38 N. D. 524, 165 N. W. 568; Columbian Nat. L. Ins. Co. v. Lemmons, 96 Okla. 228, 222 P. 255; Security Ins.. Co. v. Cameron, 85 Okla. 171, 205 P. 151, 27 A.L.R. 444; Johnson v. Farmers' Ins. Co. 184 Iowa 630, 168 N. W. 264; Kukuska v. Home Mut. Hail-Tornado Ins. Co. 204 Wis. 166, 235 N. W. 403; Fox v. Volunteer State L. Ins. Co. 185 N. C. 121, 116 S. E. 266; DeFord v. New York L. Ins. Co. 75 Colo. 146, 224 P. 1049; Wallace v. Hartford F. Ins. Co. 31 Idaho 481, 174 P. 1009; Vance, Insurance, 2d ed. pp. 188–192; 3 Couch, Insurance, § 572; 75 U. of Pa. L. Rev. p. 207; 40 Yale L. J. p. 121.

In our opinion this latter line of decisions announces the correct principle. These decisions recognize facts to be what they are. They do not attempt to force the facts to fit a ready-made legal mold. They recognize the status and relationship of the parties, as they are, and measure the obligations of the parties accordingly.

It has long been recognized that "the business of insurance is quasi public in character" (32 C. J. p. 981), and that the state has the "right to regulate the conduct by corporations, domestic and foreign, of insurance as a business affected with a public interest. This includes provision for 'unearned premium fund or reserve; then came the limitation of dividends, the publishing of accounts, valued policies, standards of policies, prescribing investments, requiring deposits in money or bonds, confining the business to corporations, . . . limitations of risks, and other regulations, equally restrictive.' German Alliance Ins. Co. v. Lewis, 233 U. S. 412, 58 L. ed. 1022, 34 S. Ct. 612, L.R.A. 1915C, 1189. It includes, moreover, the restrictions of defense to recovery on policies, and the forbidding of stipulations to evade such restrictions." National Union F. Ins. Co. v. Wanberg, 260 U. S. 71, ·73, 74, 67 L. ed. 136, 138, 43 S. Ct. 32. It is competent for the state, under its police power, to determine who may engage in the business of insurance "within its boundaries, and to prescribe terms and conditions on which the business may be conducted, and generally to regulate the business and all persons engaged in it, whether as individuals, partnerships, voluntary associations, or corporations." The right of a corporation "to engage in it is a franchise." 32 C. J. p. 981. The

state may require all agents of insurance companies to be licensed, and make it a criminal offense for any person to act as agent for an insurance company who is not so licensed. State v. Hogan (Re Hogan) 8 N. D. 301, 58 N. W. 1051, 45 L.R.A. 166, 73 Am. St. Rep. 759; 32 C. J. pp. 999, 1003. The state may impose personal liability upon an agent for risks written by him in a foreign company not authorized to do business in the state. 32 C. J. 1001. The state may impose upon a life insurance company the obligation to pay damages and attorneys' fees in case of unreasonable default in the payment of a loss under one of its policies. Fidelity Mut. Life Asso. v. Mettler, 185 U. S. 308, 46 L. ed. 922, 22 S. Ct. 662. The state may regulate insurance rates (German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. ed. 1001, 1011, 34 S. Ct. 612, L.R.A.1915C, 1189), and may prohibit an insurance company from making any discrimination in rates charged on risks of the same class. 32 C. J. 983. The Legislature may prescribe a standard form of policy, and require that the policy shall state certain facts and contain certain conditions. Continental L. Ins. & Invest. Co. v. Hattabaugh, 21 Idaho 285, 121 P. 81; Atty. Gen. ex rel. Michigan Lubricator Co. v. Commissioner of Insurance, 148 Mich. 566, 112 N. W. 132; New York L. Ins. Co. v. Hardison, 199 Mass. 190, 85 N. E. 407, 127 Am. St. Rep. 478. The Legislature may provide that an acknowledgment in the policy of the receipt of the premium shall be conclusive evidence of its payment, notwithstanding a stipulation in the policy that it shall not be binding until the premium is actually paid. Peever Mercantile Co. v. State Mut. F. Ins. Co. 25 S. D. 406, 127 N. W. 559. It may, also, provide that a life insurance policy shall be nonforfeitable after payment of a certain number of premiums (New York L. Ins. Co. v. Cravens, 178 U. S. 389, 44 L. ed. 1116, 20 S. Ct. 962), or that such policy shall be incontestable after a specified time. Vance, Insurance, 2d ed. p. 818; 37 C. J. 539. Where the nature of the risk is such that any appreciable delay in acting on the application is likely to subject the applicant to the very loss the insurance is intended to indemnify against, the Legislature may provide that failure to reject the application within a specified time shall operate to put the insurance applied for into effect, and render the insurance company liable for loss. Vance, Insurance, 2d ed. p. 190. Thus, in National Union F. Ins. Co. v. Wanberg, 260 U. S. 71, 67 L. ed. 136,

43 S. Ct. 32, supra, the Supreme Court of the United States upheld the constitutionality of a state statute which provided that "every insurance company engaged in the business of insuring against loss by hail in this state, shall be bound, and the insurance shall take effect from and after twenty-four hours from the day and hour the application for such insurance has been taken by the authorized local agent of said company, and if the company shall decline to write the insurance upon receipt of the application, it shall forthwith notify the applicant and the agent who took the application, by telegram, and in that event, the insurance shall not become effective." The Court further held that a provision in the application for a hail insurance policy to the effect that the policy shall not take effect until a company's agency (other than the local agent), in a designated city in another State, shall have an opportunity to examine the application and approve it is void,—"because it defeats the very object of the statute." 260 U. S. 77, 67 L. ed. 139, 140, 43 S. Ct. 32.

It will be noted that the State, under its police power, in the interest of the general welfare, may regulate not only the business of insurance in a general way, but it may, also, regulate contracts of insurance, and in a large measure prescribe the terms and conditions of such contracts, and it may impose duties and obligations incident to the relation created by the contract or the negotiations for a contract different from those arising or existing under other contracts or negotiations for contracts, and it may prohibit the parties from altering such duties or obligations. In view of the nature of the business and the subject involved, and the circumstances and the relation of the parties, the state may impose upon an insurance company which, through its agent, has solicited and received an application for insurance an obligation of the same force and extent as if the application had been approved and policy issued, unless the insurance company, within a specified, limited reasonable time, rejects the application and notifies the applicant of the rejection. National Union F. Ins. Co. v. Wanberg, supra.

The Supreme Court of the United States has indicated in no uncertain terms that the right to engage in business as an insurer is not a natural right, but is rather in the nature of a privilege or franchise, which may be granted or withheld as the state, in the exercise of its

police power, may deem wise; that the business of insurance "by circumstances and its nature, may rise to be one of public concern;" and that such business and the contracts of indemnity written by insurers are "essentially different from ordinary commercial transactions." German Alliance Ins Co. v. Lewis, 233 U. S. 405–418, 58 L. ed. 1019–1024, 34 S. Ct. 612, L.R.A.1915C, 1189.

The Supreme Court of the United States has said: "How can it be said that the right to engage in the business is a natural one when it can be denied to individuals and permitted to corporations? How can it be said to have the privilege of a private business when its dividends are restricted, its investments controlled, the form and extent of its contracts prescribed, discriminations in its rates denied, and a limitation on its risks imposed? Are not such regulations restraints upon the exercise of the personal right—asserted to be fundamental—of dealing with property freely, or engaging in what contracts one may choose, and with whom and upon what terms one may choose?

"We may venture to observe that the price of insurance is not fixed over the counters of the companies by what Adam Smith calls the higgling of the market, but formed in the councils of the underwriters, promulgated in schedules of practically controlling constancy which the applicant for insurance is powerless to oppose, and which, therefore, has led to the assertion that the business of insurance is of monopolistic character and that 'it is illusory to speak of a liberty of contract.'" (233 U. S. 416–417, 58 L. ed. 1023, 1024, 34 S. Ct. 612, L.R.A.1915C, 1189.)

"We have shown that the business of insurance has very definite characteristics, with a reach of influence and consequence beyond and different from that of the ordinary businesses of the commercial world, to pursue which a greater liberty may be asserted. The transactions of the latter are independent and individual, terminating in their effect with the instances. The contracts of insurance may be said to be interdependent. They cannot be regarded singly, or isolatedly, and the effect of their relation is to create a fund of assurance and credit, the companies becoming the depositories of the money of the insured, possessing great power thereby, and charged with great responsibility. How necessary their solvency is, is manifest. On the other hand, to the insured, insurance is an asset, a basis of credit. It is practically a

necessity to business activity and enterprise. It is, therefore, essentially different from ordinary commercial transactions, and, as we have seen, according to the sense of the world from the earliest times,—certainly the sense of the modern world,—is of the greatest public concern." (233 U. S. 414, 415, 58 L. ed. 1022, 1023, 34 S. Ct. 612, L.R.A.1915C, 1189.)

The purpose and nature of life insurance contracts, and the duties which the insurer assumes under such contracts, and the manner in which such contracts are negotiated impress such contracts, and the relationship of the parties, even during the negotiations, with characteristics unlike those incident to contracts and negotiations for contracts in ordinary commercial transactions.

At the very outset, the applicant is required to answer in writing, and over his signature, many questions, some of them of a distinctly personal nature. Where a medical examination is required, the applicant is further required by the insurer, as a basis for continuation of the negotiations, and for a consideration of his application or offer, to submit himself to a medical expert employed by the insurance company, and permit such medical expert to make a searching physical examination; and as a part of such examination, the applicant is again required to answer many intimate questions put to him by the examiner, and to sign his name to the report containing the questions propounded by the examiner, and the answers given thereto by the applicant. From the time the soliciting agent begins to propound questions to the applicant and to write his answers in the application, the negotiations are rather confidential in character; and when the application, and the medical examination have been completed, a relation has been created quite different from that which exists when an offer is made in an ordinary commercial transaction. So too, the very object of a life insurance contract is one involving confidence and trust. The applicant makes an application, which, if accepted, will result in a contract that may, and probably will, be performed after his death. The breadwinner desiring to protect his wife and children against want in the event of his death; the father desiring to make provision for the education of his children, and the son to provide for his parents, asks: "How can I arrange my affairs so as to take care of these needs of those near and dear to me, after my death?" The life insur-

ance company says: "The answer is life insurance. Policies have been framed so as to accomplish the very purposes you have in mind."

It has been said that "life insurance contracts are contracts of 'adhesion.' The contract is drawn up by the insurer and the insured, who merely 'adheres' to it, has little choice as to its terms." 33 Harvard L. Rev. p. 222. Both the applicant and the insurance company are bound by the applicable laws and valid regulations promulgated pursuant thereto; but, except as so limited, the contract is prepared by the insurance company. The applicant may choose whether he will apply for insurance, and if so to what insurance company he will apply and the amount of insurance, and which one of the several types of policies he prefers; but, his choice virtually ends with the right to apply for one or more of the contracts the insurance company has to offer. He has little or nothing to say as to the terms of the offer which he will submit in his application or the contract which eventually will be made. In the great majority of cases, the negotiations for the contract are initiated by the soliciting agent and not by the applicant. The company invites an application for insurance and offers to the applicant its facilities for the making of such application. The insurance company employs certain agents whose primary, or sole, activity is to solicit applications for insurance policies. Such agents are presumptively familiar with, and in a sense experts in, the business and are compensated for the services which they render the company.

"Few persons solicited to take policies understand the subject of insurance or the rules of law governing the negotiations, and they have no voice in dictating the terms of what is called the contract. They are clear upon two or three points which the agent promises to protect, and for everything else they must sign ready-made applications and accept ready-made policies carefully concocted to conserve the interests of the company. The agent in fact prepares the contract when he writes the application, because the policy, which the applicant does not see until delivered and does not sign, follows an acceptance of the application as a matter of course. In writing the application, the agent does what the company sent him out to do. He negotiates for the company, asks questions for the company, writes down answers for the company, and makes the return for the company. . . . The subject, therefore, is sui generis, and the rules of a legal system devised to govern the forma-

tion of ordinary contracts between man and man cannot be mechanically applied to it." Pfiester v. Missouri State L. Ins. Co. 85 Kan. 97, 116 P. 245, 247.

Having applied for insurance in a certain company, the applicant naturally will not apply for the same insurance in some other company, until he is informed that his application has been rejected. Unless there is temporary insurance pending action by the company on the application, the risk against which the applicant sought protection continues, and any act of the insurer which interferes with applicant's procuring the insurance he seeks will tend to impair "the beneficial effect of the insurance system." 32 C. J. 1099.

"Under such circumstances, having in view the nature of the risk against which the insured seeks protection, is there not a duty upon the insurer to act upon the application within a reasonable time? Can the insurer, having pre-empted the field, retain control of the situation and the applicant's funds indefinitely? Does not the very nature of the transaction impose upon the insurer a duty to act?" Kukuska v. Home Mut. Hail-Tornado Ins. Co. 204 Wis. 166, 235 N. W. 403, supra. The courts, in increasing number, have answered this question in the affirmative. While the precise question has not been presented to this Court, it has been presented to a trial court in this State and received an affirmative answer (Re Coughlin, 53 N. D. 188, 205 N. W. 14), and this Court has clearly indicated its approval of the doctrine that an insurance company is under a legal duty to act promptly on an application for insurance, and to notify the applicant of its acceptance or rejection. Stearns v. Merchants' Life & Casualty Co. 38 N. D. 524, 165 N. W. 568. We approve that doctrine as the law in this State.

Is there evidence in this case from which the jury reasonably could find that there was negligent delay in acting upon the application? We are agreed there is. Ordinarily, the question whether the insurance company has been negligent in failing to act upon the application within a reasonable time, like other questions of negligence, is one of fact for the jury. Duffie v. Bankers' Life Asso. 160 Iowa 19, 139 N. W. 1087, 46 L.R.A.(N.S.) 25; De Ford v. New York L. Ins. Co. 75 Colo. 146, 224 P. 1049; Dyer v. Missouri State L. Ins. Co. 132 Wash. 378, 232 P. 346; Columbian Nat. L. Ins. Co. v. Lemmons, 96 Okla.

228, 222 P. 255; Boyer v. State Farmers' Mut. Hail Ins. Co. 86 Kan. 442, 121 P. 329, 40 L.R.A.(N.S.) 164, Ann. Cas. 1915A, 671, and Kukuska v. Home Mut. Hail-Tornado Ins. Co. 204 Wis. 166, 235 N. W. 403, supra.

In Boyer v. State Farmers' Mut. Hail Ins. Co. 86 Kan. 442, 121 P. 329, 40 L.R.A.(N.S.) 164, Ann. Cas. 1915A, 671, supra, application for insurance was made to the local agent on July 7th. He forwarded the premium note and application to the company on July 10th. On July 11th the crop sought to be insured was destroyed by hail, before the application had reached the home office of the company. The agent had no authority to issue policies, but applications were forwarded to the home office where policies were issued. The court held the insurance company liable for damages for the loss sustained to the full extent of the insurance applied for.

In Columbian Nat. L. Ins. Co. v. Lemmons, 96 Okla. 228, 222 P. 255, supra, application for life insurance was made on May 4th or 5th. The applicant became ill on May 11th and died May 24th. The court held that the evidence was sufficient to support the verdict of the jury, predicated upon the proposition that the defendant company had not acted upon the application within a reasonable time.

In Dyer v. Missouri State L. Ins. Co. 132 Wash. 378, 232 P. 346, supra, application for life insurance was made August 3d. The applicant met death by accident on August 20th. The application was rejected by the company on August 21st, after it had been advised of the applicant's death. A recovery against the insurance company for negligence was sustained.

In National Union F. Ins. Co. v. Wanberg, 260 U. S. 71, 67 L. ed. 136, 43 S. Ct. 32, supra, the Supreme Court of the United States held that the Legislature might fix twenty-four hours as the period of time within which an insurance company must act upon an application for hail insurance received by its soliciting agent, and further provided that failure to reject the application and notify the applicant of such rejection within that time should render the company liable to the same extent as though it had accepted the application and made the contract of insurance; and that such legislative enactment "is not so

unreasonable as to deprive those whom it affects of their property or liberty without due process of law."

In this case the applicant applied for insurance in April, 1933, and received a policy from the defendant company in May, 1933. The application for such policy was taken by Sundahl, defendants' agent, at Jamestown. This policy subsequently lapsed for nonpayment of premuims. The applicant discussed with Sundahl the matter of reinstatement of such policy. It is apparent that Sundahl advised the applicant as to the course to pursue. On June 1st Sundahl, as agent for the defendant, prepared, and the applicant signed, an application for insurance. He was assured by Sundahl that the application probably would be accepted and the policy issued. Furthermore, the presumption was that the application so taken would be approved and policy issued. Security Ins. Co. v. Cameron, 85 Okla. 171, 182, 205 P. 151, 160, 27 A.L.R. 444. Sundahl had authority to negotiate, write, and transmit the application. Comp. Laws, 1913, § 4959; Security Ins. Co. v. Cameron, supra. In soliciting the insurance on behalf of the defendant company, in transmitting the application for the policy, and in collecting the premium, and in whatever he did to aid or assist the defendant in transacting such business, he was an agent of the defendant "corporation to all intents and purposes." Comp. Laws 1913, § 4959, supra. In so doing, he "was merely the arm of the defendant; the obligation resting on him was the obligation of the defendant." Stearns v. Merchants' Life & Casualty Co. 38 N. D. 525, 530, 165 N. W. 568, 570.

The defendant had authorized Sundahl to execute a receipt which, when construed most favorably to the defendant, provides that upon payment of a certain premium on the proposed insurance, the insurance shall take effect as of the date of the receipt upon the company being furnished with a satisfactory report of the medical examination and if the applicant on the date of such report, in the opinion of the society's authorized officers in New York, is an acceptable risk under its rules and the application is otherwise acceptable on the plan and for the amount and at the rate of premium applied for. The applicant availed himself of the opportunity afforded and made payment of the required premium in a manner satisfactory to the company, so as to

authorize the agent to issue such receipt. On June 12th, he submitted himself for a medical examination. Such examination was completed on that day, and he signed the document presented to him by the medical examiner containing the answers which he had given to the questions propounded to him by the examiner. There can be little doubt that the applicant was of the belief that he was insured and that the application which had been prepared by the soliciting agent and signed by the applicant would be approved in due course, and formal policy issued. But, according to the testimony of the medical supervisor and the lay underwriters, the application prepared by the agent and signed by the applicant showed on its face that the application would in no case be accepted on the plan applied for. According to their testimony, the rules of the company provided that a policy on the five-year term plan might not be issued to an automobile salesman. If this be so, the application which the agent prepared and the receipt issued held out a false hope. The application should never have been prepared, or if prepared should have been rejected by the defendant without delay. If the testimony of the medical supervisor and the lay underwriters is true, there was no need of any investigation to determine whether the application should or should not be approved and policy issued on the plan applied for. They say it could not be approved under the company's rules. If, as defendant contends, the receipt issued did not constitute a temporary contract for insurance pending action on the application, but constituted merely an agreement that such insurance shall take effect on the date of the receipt if the applicant at that time is found to be an insurable risk under the rules of the company, and the application is otherwise acceptable, on the plan applied for—then the taking of the application, accepting payment of the premium, and issuing the receipt were a fraud upon the applicant. Comp. Laws 1913, § 5849, subds. 4, 5. Every minute the defendant delayed acting upon the application and notifying the applicant, it deprived him and the one for whose beenfit he sought insurance of the protection which the insurance was intended to afford, which the applicant was justified in believing was afforded, and which he probably would have been able to obtain, and would have obtained, elsewhere if the defendant had acted with that promptness which the circumstances required.

Appellant contends that the applicant was not an insurable risk;

that he was not insurable with the defendant, either on the plan applied for or on any other plan; and that he was not an insurable risk at all. This contention is predicated upon the proposition that the applicant was addicted to the excessive use of intoxicants. The question of insurability was submitted to the jury under instructions more favorable to the defendant than it was entitled to have given, and in our view there was ample evidence to justify a finding that the applicant was insurable. The sole reason assigned by the medical director of the defendant for rejecting the application was the excessive use by the applicant of intoxicating liquors. The testimony leaves no doubt that the action of the medical director was predicated primarily, and probably wholly, upon the reports of the investigator, Johnson, to which reference has heretofore been made. The only other reference to the use of intoxicants by the applicant, in the papers before the medical director when he passed upon the application, were certain statements in that part of the application and report prepared by the medical examiner. Therein the applicant was asked certain questions to which he made answers as follows:

"A. To what extent do you use alcoholic beverages?

"A. Beer—small amounts—rarely.

"B. Have you been intoxicated within the last five years?

"B. Yes.

"C. Have you ever taken treatment for the alcoholic or drug habit? (Details and dates.)

"C. No."

In the medical examiner's report of the physical examination, the examiner answered the following questions as follows:

"C. Is there any undue hazard to life or health from occupation or pastime which might affect the risk as to life, accident or health insurance?

"C. No.

"E. Do you know or suspect that the applicant ever has or now uses alcoholic beverages to excess or any narcotic?

"E. No.

"G. Do you know of anything in connection with the moral character, physical condition, or past health record not already detailed which would unfavorably affect his insurability?

"G. Only that he drinks quite heavy at intervals."

The medical director of the defendant testified as follows:

"Q. Does the fact that an applicant states that he has been intoxicated once have an effect upon his insurability, in your opinion?

"A. Very little.

"Q. Does the fact that a man uses small quantities occasionally of liquors or beer have any effect upon your passing upon his insurability?

"A. Very little. . . .

"Q. So that, referring to the report of Dr. DePuy, made on June 12, 1934, Defendant's Exhibit 5 for Identification, the fact that Dr. DePuy stated that the applicant drinks quite heavily at intervals, would not in itself have caused you to turn this risk down?

"A. Not in itself.

"Q. Outside of that statement of Dr. DePuy, would you say that the applicant was an insurable risk for any insurance: Just on the report, nothing else?

"A. From the report I should say that he might be."

At the trial the defendant called as a witness the medical examiner at Jamestown who examined the applicant on June 1st, 1934, and who made the report to which reference has been made. On his direct examination such examiner testified that the answers to the several questions were in his handwriting and that he wrote them himself. No question was asked him concerning Bekken's use of intoxicants or concerning any personal knowledge on his part about the use of intoxicants by the applicant, Bekken. His testimony is entirely silent on this question. On cross-examination he stated that he could not recall anything and that on examination of his report he could not see there was anything that would indicate any impairment of Bekken's health occasioned by the use of intoxicating liquor. He further stated that Bekken's blood pressure at the time of the examination on June 1st, 1934, evidenced a more favorable condition of health than the report of the examination made in April, 1933, although the difference was not very substantial. One, Bernard, the employer of Bekken at the time of his death, was called as a witness. He testified that the applicant, Bekken, was employed by him first in 1928, and that he continued in his employ until his death, with the exception of about one year when he was employed by Lippert, the Studebaker Distributor

at Jamestown.   He stated that, as he recalled, Bekken's employment by Mr. Lippert was for something less than a year and that Bekken returned to Bernard's employ approximately one year before his death. Bernard testified positively that he had never discharged Mr. Bekken; that there never had been any disagreement between them; and that he was a good salesman.   On being asked whether, at any time during the time of his employment, Bekken had been around the place of business in an intoxicated condition, he answered that he had seen him at times showing the influence of liquor but that he had never seen him intoxicated around the place of business.   He further testified:

"A. Now, there is times that he wouldn't be around the place, perhaps, but may be he would be at home, he didn't feel like coming around, but the reason I don't know, but he was never intoxicated, making a business of being intoxicated around the place.

"Q. I ask you to state if Mr. Bekken was a sensitive natured man with reference to those matters?

"A. He was very sensitive, very sensitive.

"Q. You mean to say if he had the influence of liquor he would retire—

"A. Yes, sir.

"Q. You didn't know anything about it so far as you were concerned, what was going on when he wasn't around there?

"A. No, sir, I did not.

"Q. Would you say, Mr. Bernard, as to how frequent such might be—how frequently these intervals might be when he might be away?

"A. Covering what period of time?

"Q. Well, the last year for instance, or during the entire period that he worked for you?

"A. Well, I would say perhaps in the last year it might be two or three times.

"Q. That he was away from the office for a day or two?

"A. Yes, sir.

"Q. And you didn't know, or you don't now know whether he was intoxicated or not?

"A. I never saw him take a drink in my life, I don't know whether he was intoxicated or not."

On being asked whether the report of Johnson to the effect that

Bekken was intoxicated twenty-five times a year was a correct and truthful statement, he answered—"To my knowledge, no." Reference has already been made to the testimony of Lippert. As said, the evidence shows that the local investigator, Johnson, interviewed Lippert and endeavored to obtain from him a statement tending to corroborate the report which he had made, but that Lippert refused to give it, stating that it was untrue. The evidence further shows that the district inspector at St. Paul came to Jamestown and interviewed Bernard a year or so after Bekken's death with respect to Bekken's use of intoxicants.

It is clear from the evidence that the jury was justified in finding that the action of the medical director in rejecting Bekken's application was not based upon truth, but upon falsehood. The jury was wholly justified in finding that the reports of Johnson were false. They were also justified in disregarding the statement in the report of the local examiner to the effect that Bekken drank excessively at intervals. The record fails to disclose any basis for this statement, and when the examiner was called as a witness there was no attempt to have him explain the apparent inconsistency in the answers which he had made to questions concerning Bekken's use of intoxicants. There was no attempt to have the examiner testify as to any knowledge on his part as to Bekken's use of intoxicants. Notwithstanding, Bekken had lived in Jamestown for a number of years, and must have been known to a great many people, no evidence was produced, except as above stated, to show that he was given to an excessive use of intoxicants.

In view of the evidence the jury were justified in finding that Bekken was an insurable risk. They were justified in finding that the reports on which the medical director acted were untrue, and that the last report was prepared after Bekken's death for the purpose of furnishing a plausible ground for rejecting the application.

The jury was also justified in finding that if defendant had acted conformably to duty, the applicant, at the time of his death, probably would have been insured in the amount applied for in a contract payable to the plaintiff as beneficiary. The applicant was not a stranger to life insurance. He also carried insurance with at least one other company. The very type of policy which he applied for indicated that his desire for insurance did not spring from any desire for personal

benefit. He sought insurance on a plan, the primary, if not the sole, purpose of which was to insure payment of a certain sum to his widow in case of his death. His real purpose was to reinstate the lapsed policy which was in like amount, and payable to his wife as beneficiary. Apparently, the application for a new policy rather than an application for reinstatement of the lapsed policy was made upon the advice of the soliciting agent. The statement, or intimation, that the defaulted premiums on the former policy had accumulated and that the aggregate sum had become so large that applicant was unable to raise the money with which to make the required payment, when viewed in light of the facts and circumstances in the case, is not of such compelling force that the jury was required to accept it. The applicant availed himself of the opportunity, which the defendant had authorized its soliciting agent to extend, of paying the premium so as to obtain the benefit of the protection that it held.out the receipt would give. The fact that payment was made by note instead of in cash does not affect the situation at all. According to the evidence, the note was made payable to the soliciting agent and he, in his dealings with the company, was charged with the premium payment for which the note was given.

In the decision here we have laid on one side the question whether the receipt evidenced a temporary contract of insurance. The case was tried in the court below and was submitted to the jury on the theory that recovery was sought on account of defendant's negligence in acting on the application, and the payment of the premium and the issuance of the receipt were presented as factors bearing upon the question of negligence. There seems to have been little, if any, contention in the trial court that the receipt evidenced a temporary contract of insurance pending action upon the application. And while the contention is advanced in this Court by the plaintiff that the receipt evidenced a temporary contract of insurance, the principal contention, nevertheless, is the same here as that advanced in the district court. Accordingly, we do not decide the question whether the receipt evidences a temporary contract of insurance. But, in order that there may be no misconception as to our holding, we deem it proper to say that we do not construe the receipt as not evidencing such contract,— we merely accept as the basis for a decision of the case here the construction given to the receipt by the trial court,—a construction which

is the one most favorable to the defendant of which the receipt is susceptible.

It is further contended by appellant that the cause of action is one for tort and hence did not survive the death of Bekken; but that if the action did survive, there is in any event no proof that the deceased or his estate has sustained any damage.

In this State every action must be prosecuted in the name of the real party in interest (Comp. Laws 1913, § 7395), with the exception that an executor or administrator, a trustee of an express trust, or a person expressly authorized by statute may sue without joining with him the person for whose benefit the action is prosecuted. Comp. Laws 1913, § 7397. Our laws provide that a contract made exclusively for the benefit of a third person may be enforced by such third person before the parties thereto rescind it. Comp. Laws 1913, § 5841. And that every person who suffers any loss or harm in person or property from the unlawful act or omission of another, may recover from the person in fault compensation therefor in money which is called damages. Comp. Laws 1913, §§ 7139, 7140. Wrongful interference with contractual rights, whether such interference induces or prevents a third person to refrain from forming a contract, or induces such person to break an existing contract, will render the person whose wrongful conduct is responsible for these results liable in damages to the party injured. 62 C. J. 1137 et seq.; 2 Cooley, Torts, 4th ed. §§ 225 et seq. In this case a life insurance contract was made in May, 1933, in which the defendant insured the life of Oscar H. Bekken in the sum of $2,000, payable to Bekken's wife as beneficiary. The policy lapsed. The applicant desired to have it reinstated—that is, he desired to have put in force, and continued in force, the insurance contract which, in event of his death, would obligate the defendant to pay to his surviving widow the sum of $2,000 and which policy provided that if lapsed it might be reinstated upon certain conditions. After consultation with, and upon the advice of, the defendant acting through its authorized agent, Bekken submitted an application for a new policy which would furnish the same protection that the lapsed policy had given. Upon the submission of such application to the defendant, at its own invitation, there came into being a relation which imposed upon the defendant certain legal duties incident to its action

on such application.  These duties extended not only to the applicant, but as well to the person for whose benefit the relations between the applicant and the defendant had been established.  The primary reason for the formation of that relation—for the making of the first contract of insurance and for the application for the second contract of insurance—was to insure the payment by the defendant to the beneficiary of the sum of $2,000 in event of the applicant's death.  The insurance applied for was temporary in its nature, and the primary purpose thereof was to afford payment to the beneficiary of the stipulated sum in event of the death of the insured.

In certain circumstances a contract may create such a relation between a party to a contract, and a third person not a party to the contract that failure or neglect in performance of the contracted duty may bring into being a cause of action in favor of such third person and against the contracting party who failed to perform his contracted duty.  Thus, where a telegraph company is charged with knowledge that the addressee has an interest in a telegram which it has received for transmission, the telegraph company is charged with a legal duty to the addressee to transmit and deliver the telegram without undue delay, and the addressee is entitled to recover compensation for any injury which he may sustain by reason of the failure of the telegraph company to perform such duty.  McLeod v. Pacific Teleph. Co. 52 Or. 22, 94 P. 568, 95 P. 1009, 15 L.R.A.(N.S.) 810, 18 L.R.A.(N.S.) 954, 16 Ann. Cas. 1239; Western U. Teleg. Co. v. Woodward, 84 Ark. 323, 105 S. W. 579, 13 Ann. Cas. 354.

The relation between Bekken and the defendant imposed upon the defendant certain duties.  The primary and ultimate duty that the parties had under consideration concerned the payment to Bekken's wife of a certain sum of money in the event of Bekken's death.  That was the duty that would have rested upon the defendant if the contract applied for had been made.  Whatever protection it was represented would be afforded, by the receipt that was issued, prior to the delivery of the policy of necessity was intended to operate for the benefit of the beneficiary named in the application.  If the medical director of the defendant had approved the application and the defendant company had determined that under the conditions of the receipt there was liability on its part, then obviously the amount of the policy applied for

would have been payable to the beneficiary named in the application, namely, Bekken's wife and to no one else.

It is our view, therefore, that Ethel M. Bekken, the beneficiary named in the application, may maintain action against the defendant for the detriment which she sustained by the neglect of duty on the part of the defendant; and that the complaint alleges facts showing the existence of a duty on the part of the defendant to said Ethel M. Bekken, as well as to the applicant, a breach of such duty, and a resultant injury to her for the amount of the insurance applied for; and that the evidence adduced is ample to sustain a finding in favor of the plaintiff and against the defendant as to the controverted material facts. We are fully aware that the general holding of the courts, where the question has arisen, is to the effect that the right of action for neglect of duty in acting upon an application for life insurance is vested in the estate of the applicant, and not in the person named as beneficiary in the application. We are not concerned with whether under the facts in the cases where such holding was made, the rule was correct or incorrect. We are agreed that under the facts in this case the duty of the insurance company extended to the beneficiary named in the application; she was the one injured by the tortious acts of the defendant,— she is the real party in interest (20 Standard Proc. p. 901), and may maintain suit in her own right for the injury sustained. See Funk, Duty of Insurer to Act Promptly on Applications, 75 U. of Pa. L. Rev. pp. 224, 225. See also 20 Standard Proc. p. 901; Carter v. Bankers L. Ins. Co. 83 Neb. 810, 120 N. W. 455.

It is true the plaintiff did not bring this action in her individual capacity,—she brought it as administratrix of the estate of Oscar H. Bekken, deceased. But, as we view the matter, this is not of controlling importance. "Where it is not necessary for a plaintiff to sue as executor or administrator, the fact that he styled himself as 'administrator' or 'executor' may be disregarded and all averments in his petition to his official capacity may be treated as mere surplusage." 8 Standard Proc. p. 740. And in a case like this, where the person who brings the suit as a representative is the only person who has any personal interest, right or interest in the action and in the recovery that is sought therein, no possible injury can result to the defendant. There can be no "prejudice to anyone but plaintiff herself, and defendant

cannot complain." Tomson v. Iowa State Traveling Men's Asso. 88 Neb. 399, 129 N. W. 529. See also 24 C. J. 737, § 1819; Munroe v. Providence Permanent Firemen's Relief Asso. 19 R. I. 363, 34 A. 149. Recovery in this action is a bar to another action, either in behalf of the estate or by the plaintiff in her individual capacity. Tomson v. Iowa State Traveling Men's Asso. 88 Neb. 399, 129 N. W. 529, supra; see also Rogers v. Gosnell, 51 Mo. 466. The institution of the action by the administratrix will be presumed to have been with the consent of the plaintiff as an individual. Brown v. Greenfield Life Asso. 172 Mass. 498, 53 N. E. 129.

If recovery were awarded to plaintiff, in a representative capacity, the amount recovered would not become part of the assets of the estate, but she would hold the money, as representative, in trust for herself as an individual. Re Coughlin, 53 N. D. 188, 205 N. W. 14; Munroe v. Providence Permanent Firemen's Relief Asso. 19 R. I. 363, 34 A. 149, supra. By payment of the judgment defendant will effectively discharge all possible claims—either of the estate of Oscar H. Bekken, deceased, or of the plaintiff, Ethel M. Bekken, individually.

Certain assignments of error are predicated upon rulings in the admission of evidence. Others upon the court's instructions to the jury. It is unnecessary to review these at length. Most of them have been disposed of, or are rendered immaterial, by what has been said in this opinion. All have been considered. None are prejudical. The court's instructions to the jury considered as a whole are not only non-prejudicial, but distinctly favorable to the defendant. No prejudice to the defendant could have resulted from any of the rulings complained of.

It follows from what has been said that the judgment and order must be affirmed. It is so affirmed.

MORRIS, BURKE, and BURR, JJ., concur.

NUESSLE, Ch. J. I concur in the result.