[File No. 7246]

MARJORY MANN, Plaintiff and Respondent, v. POLICY-
    HOLDERS' NATIONAL LIFE INSURANCE COMPANY,
    a Foreign Corporation, Defendant and Appellant.

(51 NW2d 853)

Opinion filed February 8, 1952

*Vogel* and *Danforth & Danforth,* for appellant.
*Murray & Murray,* for respondent.

GRIMSON, J. On April 4, 1949, Lewis J. Mann made application to the Policyholders National Life Insurance Company, a foreign life insurance corporation with headquarters at Sioux Falls, South Dakota, duly licensed to do business in North Dakota, for a policy of life insurance in the amount of $2500.00. The application was taken by its general agent who gave Mann

a receipt for the first premium. Mann designated his wife, Marjory R. Mann, this plaintiff, as beneficiary. He was given a physical examination on April 14, 1949, by the doctor designated by the insurance company. The doctor testified he found Mann in good physical condition. Some errors, however, crept into the report of that medical examiner. Such report was not received at the home office of the company until May 2, 1949. It was not returned to the doctor but some attempt was then made by the employees of the company to get a correction of the errors or a further medical examination. Whether because of the manner in which defendant's agents tried to do that or because of Mann's own negligence in regard thereto such errors were never corrected nor any further medical examination had. Mann was never notified of the acceptance or rejection of his application. No policy was ever issued. Four months after the date of the application and of the receipt, on July 4, 1949, Mann died. On Oct. 16, 1949, this plaintiff demanded delivery of the policy or refund of the first premium as provided by the receipt. This defendant acknowledged receipt of the letter but neither issued the policy nor returned the premium.

On Feb. 7, 1950, this action was commenced. The complaint alleges both a failure by the defendant to carry out a contract for insurance and the failure of the defendant through its carelessness and negligence to carry out its duty to act on the application within a reasonable time, and demands damages in the sum of $2500.00, the amount of the insurance applied for.

The answer of the defendant admits receiving the application of Lewis J. Mann, and his death, but alleges that from the medical examiner's report it appeared that the applicant was not insurable without further medical examination of which the applicant was notified; that he refused, neglected and declined to furnish any supplemental medical examination; that under the terms of the application itself the defendant incurred no liability under the circumstances. The answer further alleges that the applicant never paid the first premium and that if any receipt was issued said receipt was conditional, providing that no liability should attach until the policy was issued and if no policy issued the premium would be returned.

The case was tried entirely on the theory of negligence. In submitting the case to the jury the court said: "The gist of this action is alleged negligence on the part of the defendant in failing to act upon such application of insurance, . . ."

The case was submitted to the jury after a motion for a directed verdict on the ground of the insufficiency of the evidence had been denied. The jury found for the plaintiff for $2500.00 and interest.

After the entry of judgment defendant made a motion for a judgment notwithstanding the verdict or in the alternative for a new trial. That motion was denied and judgment entered. This appeal is from the judgment and the order denying the defendant's motion for judgment notwithstanding the verdict or for a new trial.

We will first consider the defendant's claims that to permit a recovery on the theory of negligence under the circumstances of this case denies the defendant the right to contract and is contrary to the constitutions of the State of North Dakota and of the United States.

The insurance business is affected with a public interest. It affects the lives and well being of the people. Because thereof the state, under its police power has the right to prescribe conditions under which it can be carried on and regulate the conduct of such business within the state. 44 CJS, Insurance, Secs. 55, 56, p 518. "The business of insurance is subject to legislative regulation in the interest of the public." Wanberg v. National Union Fire Insurance Co., 46 ND 369, 372, 179 NW 666. "The state has the 'right to regulate the conduct by corporations, domestic and foreign, of insurance business as a business affected with public interest.'" Bekken v. Equitable Life Assurance Society, 70 ND 122, 293 NW 200. "The legislature may prescribe the rules and regulations with respect to that business (life insurance) designed to protect the public." Mutual Life Insurance Company v. State, 71 ND 78, 87, 298 NW 773, 138 ALR 1115.

Our legislature has done that by the enactment of an insurance code, Title 26 NDRC 1943. Before an insurance company can do business in this state it has to secure from the Commis-

sioner of Insurance a certificate of authority. It must obtain a license from the Commissioner for every soliciting agent and such agent must be a legal resident of the state. Standard forms of policy are prescribed. The conduct of insurance business generally is regulated by statute.

In Bekken v. Equitable Life Assurance Society, supra, this court, in a very thorough and able opinion written by Judge Christianson, considered this whole matter of insurance, the nature thereof, the relationship of the insured to the insurer and the right of the state to regulate the business for the protection of the insured. Many cases from other courts are there cited and examined. In that case this court approved and followed a long line of decisions, ably analyzed, which hold: "That an insurance company that has solicited and received a completed application for insurance is under a legal duty to take prompt action on the application, and give prompt notice to the applicant of its action; and that consequently such insurance company is liable in tort for negligent delay in acting upon the application, and notifying the applicant in case the application is rejected." While other courts have held to the contrary, that principle was adopted and is controlling in this state. It is supported by much authority. In addition to the cases cited in the Bekken case the following are amongst the cases so holding: Metropolitan Life Ins. Co. v. Brady, 95 Ind App 564, 174 NE 99; Live Stock Insurance Co. v. Stickler, 64 Ind App 191, 115 NE 691, 694; Walker v. Farmers Insurance Co., 51 Iowa 679, 2 NW 583; Security Ins. Co. v. Cameron, 85 Okl. 171, 205 P 151, 27 ALR 444; Childers v. New York Life Ins. Co. 117 Okl 7, 245 P 59; Brown v. Missouri State Life Ins. Co. 124 Okl 155, 254 P 7.

In Duffie v. Bankers Life Association, 160 Iowa 19, 139 NW 1087, 46 LRA NS 25, the Court said: "But it is said that a certificate or policy of insurance is simply a contract like any other as between individuals, and that there is no such thing as negligence of a party in the matter of delay in entering into a contract. This view overlooks the fact that the defendant holds and is acting under a franchise from the state. The legislative policy, in granting this, proceeds on the theory that chartering

such association is in the interest of the public to the end that indemnity on specific contingencies shall be provided those who are eligible and desire it, and for their protection the state regulates, inspects, and supervises their business. Having solicited applications for insurance, and having so obtained them and received payment of the fees or premiums exacted, they are bound either to furnish the indemnity the state has authorized them to furnish or decline so to do within such reasonable time as will enable them to act intelligently and advisedly thereon or suffer the consequences flowing from their neglect so to do."

When the life insurance business is considered in this light it is clear the duty laid on an insurance company to act promptly on an application for life insurance does not impair its right of contract. Having received a certificate of authority from the state the insurance company must transact its life insurance business in this state under the rules and regulations laid down by the legislature and the interpretation given these rules and regulations by the Supreme Court. These conditions, including the duty to act promptly upon an application for life insurance, are not unreasonable. It should be comparatively easy for an insurance company to comply and to accept or deny the application within a reasonable time. It still has the liberty to enter into a life insurance contract.

The case of Wanberg v. National Union Fire Insurance Co. 46 ND 369, 179 NW 666, involves Sec. 4902 CL 1913, which provided that hail insurance should take effect twenty-four hours after the application was taken unless sooner declined by the insurance company. This court said:

"In recognition of the necessity for the prompt consummation of the business of hail insurance, the legislature has set a limit of twenty-four hours for the rejection of an application within which time the risk is not insured. In view of the peculiarities attaching to this form of insurance we cannot say that this period is unreasonable. . . . It is within the police power of the state and does not deprive insurance companies of liberty of contract or property without due process of law."

This case was thereupon brought before the United States

Supreme Court upon a writ of error and affirmed in an opinion written by Chief Justice Taft. He says:

"This does not force a contract upon the company. It need not accept an application at all or it can make its arrangements to reject one within twenty-four hours. . . . While the time allowed is short, we cannot say that it is unreasonable in view of the legitimate purpose of the legislation and the possibilities of modern business methods. . . . (The statute) does not deprive such companies of the liberty of contract, and so of their property, without due process of law, or deny them legal protection of the laws."

We will next consider defendant's claim that the negligence in this case, if any, occurred in South Dakota by the failure of the officers at the home office to act upon the application. Defendant claims that the South Dakota law should therefore govern and that under South Dakota law an action ex delicto in this kind of a case will not lie.

When the defendant received its certificate of authority to carry on its business within this state it submitted to the conditions required by the state for the conduct of such business. The standards by which compliance therewith on the part of the defendant must be met are determined by the legislative enactments and judicial decisions of the state. ALI Restatement of Law of Torts, Negligence, Sec 285, p 746. One of these standards is that action on a life insurance application must be taken within a reasonable time.

The obligation of the defendant to conform to that standard and to act on the Mann application within reasonable time arose because of an insurance transaction by the defendant in North Dakota. Plaintiff claims that because of the failure of the defendant to act in accordance with that standard the plaintiff suffered an injury when she failed to receive the insurance applied for. During all that time she was a resident of the State of North Dakota. The place of her injury and loss was in North Dakota. That is where the alleged wrong was committed.

"The place of wrong, the law of which governs torts is the place where an injury is suffered rather than the place where

the act which caused the injury was committed." 15 CJS Conflict of Laws, Sec 12, p 899.

In Dallas v. Whitney et al. 118 W Va 106, 188 SE 766, it is held that: "The rule seems to be that where a cause is put in motion in one jurisdiction that results in injury in another, the law of the latter jurisdiction is the law by which the substantive rights of the parties are to be determined."

It follows that in determining whether the defendant's negligence in regard to its duties under its certificate of authority resulted in loss to the plaintiff the laws of the State of North Dakota govern.

The motion for judgment notwithstanding the verdict or in the alternative for a new trial was brought before the District Court and denied. The decision of the District Court on a motion for judgment notwithstanding the verdict amounts to a delayed action upon the motion for a directed verdict made at the close of the case. Weber v. United Hardware and Implement Mutuals Co. 75 ND 581, 31 NW2d 456, and cases cited. It it based on the grounds given for the motion to direct the verdict. These grounds were re-assigned on the motion for a new trial and will be considered in that connection.

On the motion for a new trial the defendant specified as grounds: 1st. The insufficiency of the evidence, 2d. That the jury gave excessive damages under the influence of passion and prejudice, and 3rd. Errors of law occurring at the trial.

This court has held that specifications of error on a motion for a new trial must point out wherein the evidence is insufficient. Haslam v. Babcock, 71 ND 363, 1 NW2d 335; First National Bank v. Bremseth, 60 ND 401; Baird v. First National Bank, 60 ND 286, 234 NW 71. In Ruble v. Jacobson, 51 ND 671, 200 NW 688, this court held: "Where a party moves for a new trial he must present all grounds which he claims entitled him to a new trial. In other words, he cannot present one ground in the trial court and another ground in the appellate court." See also O'Dell v. Hiney, 49 ND 160, 190 NW 774. The reason behind our law and practice is well expressed in Shuman v. Lesmeister, 34 ND 209, 158 NW 271, "The statutory rule re-

quiring such particulars to be pointed out was designed for the information and assistance of the court and the opposing party, and will be deemed waived when not urged in the court below."

The first three specifications supporting the ground of the insufficiency of the evidence set forth no particulars of insufficiency. The next three specifications point out that the contract documents in evidence of themselves show that no policy would be in effect and no liability incurred by the defendant until the acceptance and delivery of the policy. It is correctly claimed that such acceptance and delivery would be necessary to establish a contract of insurance. It is not claimed that any contract was consummated. This action is not based upon a contract. It is based upon the neglect of the company to accept or reject the application within a reasonable time. The conditions in those instruments pointed out in the specifications absolving the defendant from liability unless the policy was issued do not govern in an action based on negligence. In such case the instruments referred to can be considered only as they may bear on the delay or negligence of the defendant. One of those instruments, at least, was held in the possession of defendant's agents for about two weeks without any action on it. To that extent at least the documentary evidence supports the claims of the plaintiff rather than the claim of insufficiency of the evidence.

The last two specifications of the insufficiency of the evidence specify the negligence of the deceased, and that there was no unreasonable delay on the part of the defendant. Those specifications require the consideration of all the evidence.

On April 4, 1949, Lewis J. Mann signed an application to the defendant for life insurance. The application had been written by A. L. Haugen who signed as general agent. Lewis J. Mann, himself, witnessed it as soliciting agent. Haugen had recently appointed Mann as such agent and had persuaded him to take out this insurance. He gave Mann a receipt for the first premium, $158.85. On the back of that receipt was printed an agreement that if accepted the policy should become effective from the date of the application but that if no policy was issued

then the premuim was to be returned. Haugen testified: "When I appoint a new agent . . . in order to get him to take the policy as soon as possible for the benefit of a new policy I advance the necessary money for him." On cross examination he testified: "Q.—Now you say that you advanced this premium money for Mr. Mann, is that right? Ans. That's right. . . ." "Q.—Then for all these so-called 'agencies' or 'agents' working for you, you require them to take out insurance for the purpose of bringing up your business, is that right? Ans.—Well I wouldn't say that we require it. We advise them to take out a policy in their own company." "Q.—To create an advertisement to build up business for the company? Ans.—That's right."

The testimony further shows that each agent kept his share of the commission and Haugen remitted only the company's share of that premium, $23.53, to the defendant. Haugen testifies that Mann never paid any part of that first premium. The evidence is clear, however, that the defendant received in cash its portion of the premium. Haugen claims he advanced that for Mann. It is not clear what the arrangement on that was as between Haugen and Mann. That is not material here. The receipt Haugen gave Mann is binding upon the defendant.

The application, together with the net first premium due the defendant was mailed by Haugen and received by the defendant on April 15, 1949 and held in a suspense account pending the acceptance of the application. It was never returned to Mann's estate.

On April 14, 1949, Mann who lived at Washburn, N. Dak., reported to Dr. Heinzeroth at Turtle Lake, North Dakota, for physical examination. Dr. Heinzeroth was the examining physician for the defendant and as such gave Mann the examination required for life insurance according to blanks furnished by the defendant. On those blanks he wrote the answers which he found by inquiry and by examination of the applicant. That part of the report which sets out the applicant's answers was signed by Lewis J. Mann and witnessed by the doctor. That part of the report which pertained to the medical examination

of Mann was signed by the doctor who indicated thereon that he "approved" the application. The report was mailed by the doctor to the company at Sioux Falls, South Dakota, and received by the company on May 2, 1949.

When the report was received at the office of the defendant it was referred to its head medical examiner for checking. He discovered that the doctor had reported the Systolic blood pressure as 140 and the Diastolic as 135. He made a notation on the report as follows: "Must have another blood pressure reading, or turn down, diastolic especially." Regarding this the doctor testified: "I would say in this special case and in probably all cases, while we withhold issuing the policy on account of a high diastolic blood pressure, almost always we interpret this as the doctor might possibly have made a mistake, so we always give him a chance to correct it if they want to correct it."

After the chief medical examiner had examined the report and made this notation on it the defendant wrote a letter addressed to Dr. G. E. Heingerath, Tuttle Lake, North Dakota, dated May 5, 1949, in which he says:

"We have received the medical examination which you completed on the life of Lewis J. Mann. According to the medical examination, you show the Systolic as 140 and the Diastolic as 135. *I believe that this must be an error, if not, will you please have the enclosed heart exercise test completed on his life* in order that we may be able to complete consideration of this case. You also neglected to furnish us with the rate of pulse. Will you please furnish us with this information. You also neglected to tell us that Mr. Mann had been advised to have a surgical operation. However, you do not include information as to whether this operation has been completed or what type of surgical operation was advised. Please furnish us with the above listed information in the near future in order that we may be able to complete consideration of this case." (Italics ours.)

Dr. Heinzeroth denies that he received this letter and it will be noticed that the name of the addressee was badly misspelled. He was asked:

"Q. Did you receive any letter from the insurance company about this?

"A. They didn't ask for that. Every other company does.

"Q. This company didn't?

"A. No.

"Q. They never wrote you at all?

"A. Pardon me, but both these here, are so ridiculous a mistake they should have sent them right back. 'Diastolic 135'—there is no such thing. That should have been about eighty. . . .

"Q. They never returned it and asked for a correction?

"A. No, because they know I made a mistake there."

The statement of the defendant's Sioux Falls doctor heretofore quoted corroborates Dr. Heinzeroth on that. Dr. Heinzeroth further testifies on cross examination:

"Q. You wouldn't say positively that you never received it (the letter)?

"A. I couldn't have.

"Q. You never received it?

"A. Not to my recollection.

"Q. You couldn't say positively that you never did?

"A. I will tell you—pardon me—if you will show me that again, I will show you why. If I had got one of those letters, I would immediately noticed this here on there—that is a mistake, in question 26. (What is the blood pressure? Systolic, 140 M.M.H.G. Diastolic, 135 M.M.H.G.) so I am pretty sure that I did not get one of them.

"Q. But you did get some blanks?

"A. I might have had those blanks, or they might have sent it—I wouldn't know. It is too long to recall all those things—we have so many of them."

The evidence of the defendant shows that there were mailed to Lewis J. Mann at Washburn, bi-monthly reports of pending applications on May 17, 1949, June 15, 1949, and July 12, 1949, showing: "Pending Medical Examinations, $2500, Lewis J.

Mann, Washburn, N.D. 4/4/49 awaiting heart exercise test and blood pressure."

Mrs. Mann and her daughter, Betty Jo, testify that Mr. Mann was very systematic and filed away everything, including personal correspondence; that they had gone through his files and found none of these notices. Whether that evidence was sufficient to overcome the presumption that a letter duly mailed was received in the due course of mail was a question for the jury.

The defendant also shows similar notices were sent to their agent, A. L. Haugen, on the same days containing the identical information. Haugen admits he received them. Then he testifies that he on three occasions told Mann that: "Your insurance is not in force—you realize that? It is not in force until the heart chart is completed." He claims that Mann answered: "As you see, I am busy with this oil business, but I will get over there just as soon as I can."

Mann did see Dr. Heinzeroth about this recheck. The doctor testifies on cross examination:

"Q. After you got those blanks did you see Mr. Mann?

"A. Yes. I saw him one day.

"Q. Where did you see him?

"A. In my office. I called him in. He stepped to the door, and I asked him to come in, and he came in, and I told him—I said, 'I have already done all this, and it is in the application, but' I said 'they have evidently sent me one of these and want me to take a recheck.' He said, 'I am on my way some place'—wherever they were going—and he said, 'I will drop in on my way back.' I never asked him again. I had made all those examinations and they were the original applications and they never sent them back.

"Mr. Murray: You mean the original report?

"A. Everything they wanted was in the original report. A recheck was what they wanted. A lot of those companies do that. They sent those blanks out and you are supposed to go over that rigamarole again.

"Q. (By Mr. Vogel) Did he come in for that recheck?

"A. Not to my recollection. I forgot all about it, myself.

"Q. You made one examination?

"A. That is right.

"Q. You did speak to him about making a second?

"A. I showed him the blank. He told me that he was busy and couldn't come in just them. He said 'I thought you done that once.' I said, 'I did and it is down there.'" . . .

"Q. No doctor seeing those figures there, would pass that man on those figures alone, would he?

"A. They would have to be corrected.

"Q. They never were corrected on the company records?

"A. They never give me any notice. The first I noticed that I had made a mistake was when I see that just awhile ago.

"Q. But you received information that they wanted a recheck?

"A. That's right—on the heart chart where they make them jump on one foot across a hall. I make them run up and down stairs. I made him run down twice. He said, 'I went through all that but I will drop in later.' I said, 'They are asking for it or I would not have got this blank.'"

On re-direct examination the doctor testified:

"Q. When Mr. Mann came in, did you tell him you had given him that test the first time you examined him?

"A. Yes, I showed it to him and told him that they required it. I told him that I had done all that. I said, 'What do you want to do about it?' and he said he didn't have time then but would be back later, but he never came.

"Q. You told him that all that information that was asked for in the second blank was given in Exhibit C?

"A. I said, 'I have given you a complete check. I don't know what they want it for. You should know what a company wants.'"

Dr. Heinzeroth further testified that he found Mann in good physical condition, that his blood pressure was normal and that he found nothing wrong with him. Mrs. Mann and her daughter, Betty Jo, testified to his good health and that he was physi-

cally a well built and strong man. Mrs. Mann testified that he had never had any heart attacks. No attempt is made to dispute this condition of health ascribed to Mann. The cause of his death does not appear.

Thus the evidence shows that the application for insurance was made at the solicitation of defendant's managing agent on April 4, 1949. According to the receipt, payment of the first premium was made on that date. Even if that payment was advanced by Haugen that was under a personal arrangement with the applicant and the inference could be drawn that it was a loan by Haugen to the applicant, or done solely to promote the business of the defendant. The application and payment were received by the defendant on April 15, 1949.

The applicant was examined by Dr. Heinzeroth on April 14, 1949. The report of the doctor on this examination was not received by the defendant until May 2, 1949. Here was a delay of at least two weeks while the application and medical report were in the possession of the defendant or its agents without any action thereon. Upon a check of that report the Chief Medical Examiner of the defendant found a very high diastolic blood pressure recorded. He testifies that he believed that the report of that diastolic blood pressure was error. Dr. Heinzeroth in his testimony admits that it was error and a very obvious error. That mistake was not because of any action of the applicant but entirely the fault of the doctor. The defendant, instead of sending back the report for correction of the error, wrote the doctor that if the report was not in error a further heart examination was necessary.

Dr. Heinzeroth's testimony indicates that he would have corrected the error and sent the report back immediately had it been returned for correction. For a new examination, however, the applicant had to be notified and had to make a trip from Washburn to Turtle Lake, a distance of 24 miles, which would necessarily have caused more delay. The letter requesting the further medical examination was somewhat ambiguous and the plaintiff argues that under this letter, if the diastolic blood pressure was error, nothing further was required. Dr.

Heinzeroth denies that he received that letter. If he did, he forgot about it and neglected to take any action on it. He admits he may have received a blank heart exercise chart. When Mann came over to Turtle Lake they talked the matter over. In that conversation the doctor assured the applicant that the defendant already had all the information that the examination called for, since the doctor had given that heart exercise on the original examination.

It is claimed, however, that the further information with regard to the pulse and the surgical operation was requested outright without any qualification. It will be noted that this was not information requested by the Chief Medical Examiner. Dr. Heinzeroth admits getting the heart exercise charts but not the letter. While Haugen evidently received the notice claimed to have been sent out by the defendant to its agents to the effect that the application was being held "awaiting heart exercise test and blood pressure" he testified that he told Mann on three different occasions that his insurance was "not in force until the heart chart is completed." That is what was emphasized. That is what Dr. Heinzeroth told Mann was what the defendant wanted. No mention of the pulse was made in the notice to the agents nor in the talk between Haugen and Mann nor in the talk between Mann and Dr. Heinzeroth. There was some indication in the original medical report regarding the pulse. The doctor had put down in answer to the question about the pulse the figure "7." He testified that it should have been "70." He had neglected to put down the "0." He also testified that the surgery advised had been successfully accomplished. To put that information in the report had been neglected. Both those omissions could have been corrected by the doctor without delay or re-examination if the report had been mailed back to him for correction.

Nothing further was done on behalf of the defendant with regard to this application before the applicant's death on July 4, 1949. Even then although receiving the plaintiff's letter of Oct. 16, 1949, the defendant did not issue the policy nor return the premium.

The complaint is based on the negligence of the defendant in

failing to accept or refuse the application of Lewis J. Mann for insurance. Objection is made because no specific allegation of the negligence of the doctor is made in the complaint. The allegation of negligence by the defendant necessarily includes the negligence of its employees or agents. In fact the defendant corporation could only be negligent through some negligent act of its employees or agents. The corporation itself has no way of acting except through its employees.

After Mann had made his application for insurance he was directed to Dr. Heinzeroth for his medical examination. Dr. Heinzeroth testified that he was acting for the defendant, he used the defendant's blanks and conducted the examination in accordance with the defendant's requirements. The weight of authority is that the medical examiner is the agent of the insurer in making the examination, taking down answers and reporting them to the company; that his knowledge thus acquired, his interpretation of the answers given, his errors in recording them are the knowledge, interpretation and errors of the company itself. 2 Couch Cyclopedia of Insurance Law, p. 1314: Sterneman v. Metropolitan Life Insurance Company, 170 NY 13, 62 NE 763, 57 LRA 318, 88 Am St Rep 625. See also editor's note, 41 LRA NS 505 et seq; Mystic Workers v. Troutman, 113 Ill App 84; Ames v. Manhattan Life Ins. Co., 40 App Div 465, 58 NYS 244, affirmed in 167 NY 584, 60 NE 1106; Fair v. Metropolitan Life Ins. Co. 5 Ga App 708, 63 SE 812; Royal Neighbors of America v. Bowman, 177 Ill 27, 30, 52 NE 264, 60 Am St Rep 201; Franklin Life Ins. Co. v. Galligan, 71 Ark 295, 73 SW 102, 100 Am St Rep 73; Iowa Life Ins. Co. v. Haughton, 46 Ind App 467, 87 NE 702.

That principle applies both in a suit on a policy of insurance and in a suit based on negligence in failing to act on an application for insurance in a reasonable time.

In the case of Dyer v. Missouri State Life Insurance Co., 132 Wash 378, 232 P 346, an action was brought to recover damages in the amount of a life insurance policy which it was alleged had not been delivered because of the carelessness and negligence of the defendant. That negligence was based on the error of the medical examiner in making his report of the examination.

The court held that the doctor was an agent of the defendant and that the defendant was liable for the delay caused by the doctor's error. That is also the holding in Evans v. International Life Insurance Co. 122 Kan 264, 252 P 266. Any negligence of Dr. Heinzeroth was the negligence of the defendant.

Defendant cites Strand v. Banker's Life Insurance Co. of Lincoln, 115 Nebr 357, 213 NW 349, and Warren v. New York Life Insurance Co., Circuit Court of Appeals, Fifth Circuit, 128 F2d 671, as authority that where there was error or delay in the medical examination for insurance no liability lay. The facts in both cases, however, distinguish them from the case at bar. In the Strand case the examining doctor failed to put down an answer to the question, "Have you ever had inflammatory rheumatism?" That failure may have been the fault of either the applicant or the doctor. The court held that on that feature the physician represented both applicant and defendant. There was no delay, however, in the transmitting of the medical report. The company twice in two weeks endeavored to get an answer to that question. Before it did the applicant died. The elapsed time from the date of the application to the death of the applicant was only sixteen days. The court held the evidence of negligence insufficient to hold the insurance company liable.

In the Warren case the applicant had fraudulently denied in his application for insurance that he had ever taken aerial flights and that he contemplated participation in aeronautics. The evidence disclosed that after making the application he immediately went to the municipal airport in Shreveport and signed for an amateur course in aviation. Upon investigation of the application the insurance company was advised that the applicant was taking flying lessons. It immediately suspended action on the application and asked for a completion of the further report on his aviation activities. The notice and blanks were delivered to the applicant. About ten days afterward the applicant was killed in an automobile accident and the notice and blanks were found in the glove compartment of his automobile. Under such circumstances the insurance company was not held liable.

The defendant also cites Evans v. International Life Ins. Co. 122 Kan 264, 252 P 266, and Savage v. Prudential Life Ins. Co. 154 Miss 89, 121 S 487, and Metropolitan Life Ins. Co. v. Brady, 95 Ind App 564, 174 NE 99 and House v. Bankers Reserve Life Co., 43 SD 440, 180 NW 69. Those courts have not found that the principle that an insurance company is liable for negligence on failure to take action on application for life insurance within a reasonable time is applicable in their states as we have in the case of Bekken v. Equitable Life Assurance Society, supra. Those cases are, therefore, in point.

A close analogy to the case at bar can be drawn from the case of Duffie v. Bankers Life Association of Des Moines, 160 Iowa 19, 139 NW 1087. The evidence showed that Joseph M. Duffie applied for membership and insurance in the association on June 8, 1911. He made his initial payments and was issued a receipt containing on the back a warning that delay in issuing a certificate might occur on account of extra work in the home office. Two days later the applicant was examined by the Association's medical examiner and found insurable. The doctor immediately notified the Association of the application and examination but left the completed application and the report of his examination on his desk for delivery to the Association by Rogers, the Association's agent, as was the agent's custom of handling his applications. Rogers, however, delayed in doing that. The Association received the doctor's notification at the head office on June 12, 1911. The doctor discovered the report still on his desk when he heard of Duffie's death about four weeks after the examination. He then sent it in. The court says:

"We think whether defendant in the exercise of ordinary diligence should have passed on the application prior to Duffie's death was fairly put in issue. The association was bound by the acts of its agents and chargeable with any consequences that resulted from the failure of Rogers to promptly forward the application and physician's report. In other words, if the association was under a duty to promptly act on the application and notify Duffie, as we think it was, it cannot shield itself from the responsibility by the fact that the application and medical

report had not been received by it and therefore it could not act. See Northwestern Mutual Life Ins. Co. v. Neafus, 145 Ky 563, 140 SW 1026, 36 LRA NS 1211. The possession of these by its agent had the same effect as if they were in the possession of the association at its home office. Assuming then that the application and medical report had been promptly forwarded by the agent, and that the application was not accepted or rejected within the time intervening prior to his death, it seems manifest that whether this was an unreasonable delay was for the jury to determine, and we so hold."

The defendant tries to distinguish the case at bar from the case of Bekken v. Equitable Life Assurance Society, 70 ND 122, 293 NW 200, on the grounds that the detrimental information regarding the applicant in the Bekken case was found to be false. That, however, was not discovered until afterwards. The information causing the delay in the instant case was an obvious error and so recognized by the defendant at once. The evidence shows that by merely sending the medical report back to the doctor for correction the delay could have been greatly shortened. The evidence in the instant case shows a much longer delay and more negligence on the part of the insurance company and its physician than is shown in the Bekken case. The only difference is whether in the case at bar there was contributory negligence on the part of Mann. That was a question for the jury if there was any evidence from which reasonable men could draw different conclusions.

Defendant's final contention is that Mann, being the agent of the defendant as well as the applicant for insurance, owed a special duty to have the medical report corrected and completed and that his neglect in that respect contributed to the failure of the defendant to act.

However, the negligence which prevented the issuance of Mann's life insurance policy in regular course arose in matters concerning which he had no duties. It is clear from the record that the policy would have been issued had the company's doctor correctly stated his findings in his original report of the medical examination, or if he had been given a chance to correct the errors he made in the original report. It is a fair inference

from the evidence that the doctor did not receive or at least completely ignored the letter from the company concerning his report of the examination. He was asked to correct his report if it was in error, otherwise to have Mann take a second examination. This second examination would have been wholly unnecessary, if the doctor had correctly reported his findings upon the first examination or if he had corrected that report when given an opportunity to do so. He did talk this over with Mann at a time Mann was passing through Turtle Lake on business. Parts of that conversation are heretofore quoted. There are indications that the doctor did not think further examination to be urgent or necessary. Mann stated that he did not have time to take the examination then but would return later. The record does not disclose when this conversation took place. It is, therefore, impossible to say with any degree of certainty what part of the delay, if any, is chargeable to Mann who lived 24 miles away. In the circumstances we think it was for the jury to say, whether Mann's delay in reporting for a second examination, an inconvenience and expense, made necessary solely because of the doctor's negligence, was contributory negligence.

After a consideration of the evidence we are satisfied that reasonable men could differ on the conclusions to be drawn therefrom and that the decision of the court denying the motion for a directed verdict and submitting the case to the jury was proper.

The jury was fully informed of the claims of the defendant as to the cause of the delay in acting on the application. The court in his instructions told the jury twice that defendant claimed that it failed to act on said application because Mann neglected to furnish the supplemental examination it had requested. He told them the defendant had the right to make an investigation to determine from the medical examination and other information whether it would issue a policy and that it had a reasonable time for that purpose. He told them further that the burden of proof was on the plaintiff to prove by the preponderance of the evidence her claim that the failure to act upon the application was due to the carelessness and negli-

gence of the defendant. Under those instructions the jury found for the plaintiff which indicates they believed that version of the evidence which was to the effect that the delay was due to the negligence of the defendant and not contributed to by the negligence of Mann.

The motion for a new trial on the grounds of insufficiency of the evidence is addressed to the sound, judicial discretion of the trial court. Its duty is to exercise its discretion in the interests of right and justice. Pengilly v. J. I. Case Threshing Machine Co., 11 ND 249, 91 NW 63; Haser v. Pape & Yellow Cab Co. 77 ND 36, 50 NW2d 240. The question before this court on an appeal from the decision of the trial court thereon is whether the court abused his discretion. Reid v. Ehr, 36 ND 552, 162 NW 903; Kohlman v. Hyland, 56 ND 772, 219 NW 228 and cases cited. The District Court in his memorandum decision on the denial of the motion for a new trial says that "The evidence was sufficient to justify and sustain the verdict. The testimony of the defendant's examining physician shows that if insured failed in any act on his part to be performed it was because of assurances on the part of the physician." There also was evidence from which the jury could have inferred that the diastolic blood pressure record was an obvious error and that the supplementary examination was neither required nor necessary. On careful consideration of the evidence we have come to the conclusion that the District Court did not abuse his discretion.

The next assignment of error on the motion for a new trial is that the jury gave excessive damages under the influence of passion and prejudice. Defendant contends that the evidence at the most justified only a return of the premium paid. There is no merit to that assignment. If there was evidence to warrant holding the defendant negligent in failing to act on the application, it necessarily was liable for the loss suffered by the plaintiff which was the amount of the insurance applied for.

The first error of law assigned is the entry of judgment upon the verdict. As we have found that it was not error to deny the motion for a judgment notwithstanding or for a new trial it follows there was no error in the entry of judgment.

Some errors are claimed in the admission of testimony. This testimony so admitted was to the effect that the deceased had displayed rolls of money about the time he made the application for insurance. While that testimony seems remote yet it cannot be considered as prejudicial.

The other errors of law specified are with regard to the denial of the court to give three instructions requested by the defendant and the failure of the court to instruct with regard to the return of the premium. The court delivered written instructions. After having given the attorneys time to consider them, he required them to take any exceptions they wanted before the delivery of the instructions. The defendant's attorney announced that he was taking "no exceptions." Sec. 28–1413 NDRC 1943 provides that the court may submit written instructions and may require counsel, after reasonable examination thereof to designate such part as they deem objectionable. "Thereafter only the parts so designated shall be excepted to by the counsel designating the same." In the instructions so given the court partially included the requests made by the defendant. It follows that when he designated no parts of the instructions for exceptions he indicated his satisfaction with the action of the court upon the requests he had made and with the instructions generally. Thereby he waived bringing any exceptions to the instructions before the court for consideration. We, therefore, cannot consider the errors now assigned. See Paulsen v. Modern Woodmen of America, 21 ND 235, 130 NW 231; Hrabek v. Patocka, 49 ND 1119, 194 NW 691.

The judgment of the District Court is affirmed.

MORRIS, C. J., and CHRISTIANSON, SATHRE and BURKE, JJ., concur.