16692

MOORE v. PALMETTO STATE LIFE INS. CO.

(73 S. E. (2d) 688)

*Messrs. Mays, Featherstone & Bradford,* of Greenwood, *for Appellant,*

494

*Messrs. Nicholson & Nicholson,* of Greenwood, *for Respondent,*

December 11, 1952.

OXNER, Justice.

In an action to recover the amount of a policy of accident insurance applied for by her husband in which she was to be named as beneficiary, respondent was awarded judgment against appellant insurance company for $1,000.00. The major question for determination is whether the evidence is sufficient to sustain the judgment.

On March 3, 1951, respondent applied to one of appellant's agents for a policy of accident insurance on her life and also submitted an application for a similar policy for $1,000-.00 on the life of her husband, who was a truck driver engaged in long distance hauling. Each application was accompanied by a deposit of 20¢ for which receipt was given, wherein it was stated:

"It is understood that this deposit will be returned if the application is not approved by the company."

The insurance company offered testimony to the effect that the application for the policy on the life of respondent's

husband was declined on March 19, 1951, because he was engaged in a hazardous occupation, and that notice to that effect was sent to the district office with direction to notify the applicant of the rejection and refund the deposit. One of the agents also testified that about six weeks later, respondent was notified of the rejection of her husband's application and there was tendered to her the deposit of 20¢.

The foregoing testimony of the agent was denied by respondent who testified that she was never notified of the rejection of the application until after her husband was accidentally killed on June 3, 1951. Her testimony as to what transpired after the filing of the application on March 3, 1951, was as follows:

"The next time I saw an. agent of Palmetto State Life Insurance Company was five weeks later. Mr. Newell came to my house collecting on some life insurance I already had and on a policy like that on myself. He brought my policy back that day.

"Q. Now what was said, if anything, in regard to the policy for which this application was written? A. I asked him where was my husband's policy like mine, did it not come back. He said, 'No, I haven't heard anything from it, but I'm not sure whether it will go through or not. We just wrote worlds of them and haven't had time to get them all back.'

"Q. We wrote worlds of them and I have not had time to get them all back. Was anything else said with regard to that policy on that date? A. Except that I asked him did he want to just put that on my premium or let it stand. He said to let it stand and in a few days he'd see.

"Q. When was the next time that you transacted with anyone? A. It was five weeks because at the time I took out this policy I only had a small life insurance policy and they only collected every five weeks.

"Q. What was said at that time with regard to your policy, the policy in question here, the one for which ap-

plication was given? A. I asked him that day if my husband's policy had come in. He said it didn't. I said, 'Do you want to put it on my premium?' He said, 'Let it stand. There was some policies came in. I'm pretty sure it might have come in that bunch.' I told him my husband said that if it wasn't going through, he wanted to take out the insurance with another company. He said, 'I'll let you know in a few days.'

"Q. Did he let you know? A. No, he did not.

"Q. When was the next time you saw or heard anything from the agent of the Palmetto State Life Insurance Company? A. On Saturday morning after my husband was buried the Monday morning.

"Q. When was your husband killed? A. June 3rd.

"Q. You heard from them on what day? A. Saturday morning following that.

"Q. Who came to see you? With whom did you talk? A. I don't remember his name. At that time I was in the bed. My niece went to the door. She told me it was the Palmetto Insurance agent.

"Q. Did you hear the conversation? A. Yes, I heard him tell her he was collecting for the Palmetto State Life Insurance Company. She came into the house and told me and I gave her the money. I told her that before you say anything to him about his being dead, unless he mentions it to you about the policy, first, you ask him did he bring the policy before you tell him he is dead. She went back and asked him. He told her to tell me that Mr. Newell wasn't with the company any more, the man that wrote the policy. He would have the manager to come to see me about it Monday morning.

"Q. What happened then? A. Instead of waiting until Monday morning, he left and was gone about 30 minutes and comes flying in there with a statement saying my husband was turned down because of being a truck driver at the time he took that out."

Timely motions were made by appellant for a nonsuit and a directed verdict upon the ground that no policy was

ever issued. These motions were refused and the case submitted to the jury, resulting in a verdict for respondent in the sum of $1,000.00. Thereafter the trial Judge likewise refused a motion by appellant for judgment *non obstante veredicto*.

Considering the testimony, as we must in the light most favorable to respondent, we have this situation: Application for the policy was made on March 3,1951. Although appellant contends that it did not write accident policies on long distance truck drivers and its agents had been so instructed, respondent was not notified of this fact and the application was not rejected until March 19th, or about sixteen days after it was received. About three weeks after this rejection, upon inquiry by respondent as to the status of the application, the agent said that he had not "heard anything from it". Respondent then asked what should be done with the premium deposit, and was told by the agent "to let it stand and in a few days he'd see." About two or three weeks prior to the death of her husband, respondent again inquired as to whether the policy had been issued and was advised by the agent that some policies had come in and that he was "pretty sure it (the policy) might have come in that bunch." Respondent then told him that her husband had said that if the application "wasn't going through, he wanted to take out the insurance with another company", to which the agent replied: "I will let you know in a few days". Respondent heard nothing further until after the death of her husband when she was notified that the application had been rejected and was tendered the deposit of 20¢.

It must be conceded that there is no evidence of formal acceptance of the application or the issuance of a policy by appellant. The crucial questions are whether there was an implied acceptance and whether the circumstances are such as to estop appellant from asserting that there was no contract of insurance.

"An application for life insurance is a mere offer or ██ proposal and until accepted, no contractual relationship exists between the applicant and the insurance company." *Keller v. Provident Life & Accident Ins. Co.,* 213 S. C. 339, 49 S. E. (2d) 577, 582. In order to constitute a contract, there must be "either an actual acceptance, or such circumstances as may imply acceptance, or estoppel from denying acceptance." *McGrath v. Piedmont Mutual Insurance Co.,* 74 S. C. 69, 54 S. E. 218, 220. "Contracts may be implied from circumstances as well as by written papers and oral agreement, and insurance contracts are no exception to the rule as numerous cases, textbooks, and digests clearly attest." *Reck v. Prudential Insurance Company of America,* 116 N. J. L. 444, 184 A. 777, 778.

"There is a conflict in the authorities as to whether legal obligations arise only after a contract of insurance has been made, or whether in certain circumstances a legal duty arises, from the relationship created during the negotiations between an applicant for insurance and the insurance company, to act promptly upon the application, and to inform the applicant whether the offer is accepted or rejected." *Bekken v. Equitable Life Assurance Society of United States,* 70 N. D. 122, 293 N. W. 200, 209. This decision contains an extended review of the cases. According to one view, mere delay or inaction, however unreasonable, by an insurance company in acting upon an application cannot afford a basis of liability. The authorities supporting this view state that insurance companies are under no duty to act upon applications, or to accept or reject them within a reasonable time. It is said that if there is no contract, there is no duty. One of the leading cases supporting this view is *Munger v. Equitable Life Assurance Society of United States,* D. C., 2 F. Supp. 914. The other view is that an insurance company is under a legal duty to take prompt action on an application for insurance and give timely notice to the applicant of its action, particularly where a deposit on the premium has been made, and that under certain circumstances an in-

surance company may incur liability for negligent delay in acting upon an application or in failing to notify the applicant after his application is rejected.

In Insurance Law and Practice by Appleman, Volume 12, Section 7226, it is stated:

"The more liberal, and probably the better rule, is to the effect that an insurance company obtaining an application for insurance is under a duty to accept it or to reject it within a reasonable time, and is liable if it delays unreasonably in acting thereon. It must also act with reasonable promptness in delivering a policy. And even though it appears that the insurer may have rejected the application, if it delays unduly in notifying the applicant of such rejection, it may be held liable as if it had accepted the risk. By failure to act upon an application duly made, the period of delay may be so unreasonable as to estop the insurer from denying liability. A retention of the application and premium payment for an unreasonable and unwarranted length of time may raise an inference of acceptance.

\* \* \*

"Principles of fair dealing would require that where the applicant has paid the first premium for the protection which he desires that the insurer act upon the application within a reasonable time. Since insurance companies are held to a broader legal responsibility than are parties to purely private contracts, having solicited and obtained an application for insurance, and having received payment of a premium, they are bound either to furnish indemnity or decline to do so within a reasonable time. If it intends to decline the policy, it must manifest its intention by return of the premium within a reasonable time."

In *American Life Insurance Company of Alabama v. Hutcheson*, 6 Cir., 109 F. (2d), 424, 427, the Court said:

"It is the general rule that mere delay in passing upon an application for insurance is not sufficient in and of itself to amount to acceptance even though the premium is re-

tained. *Misselhorn v. Mutual Reserve Fund Life Ass'n.,* C. C., 30 F. 545; 32 C. J. 1106. But an acceptance may be implied from retention of the premium and failure to reject within a reasonable time."

In adopting the more libral rule, the Court of Appeals of the 9th Circuit in *Coffey v. Polimeni,* 188 F. (2d) 539, 542, said:

"Counsel argue that, assuming negligence, the correct rule is that no action will lie against an insurance agent for delay in acting on an application where no breach of legal duty to obtain insurance appears. They concede that this view is at variance with the general trend of authority and with the great bulk of the decisions dealing immediately with the subject. A few commentators and an occasional judge have criticized this line of decisions as unorthodox or unsupported by reason, but they appear to us to announce a salutary rule. The thought they stand for is that the agent or company owes the applicant for insurance what amounts to a legal obligation to act with reasonable promptness on his application, either by providing the desired coverage or by notifying the applicant of the rejection of the risk so that he may not be lulled into a feeling of security or put to prejudicial delay in seeking protection elsewhere. Implicit in the cases is a recognition that these transactions are fundamentally unlike ordinary commercial or business dealings where mere profit is the stake, so prone is the failure of insurance protection to result in irretrievable disaster to the individual. Those engaged in the insurance business understand perfectly the peculiar urgency of the need for prompt attention in these matters."

In discussing this subject, the Court of Appeals of Louisiana in *Harding v. Metropolitan Life Insurance Co.,* 188 So. 177, 182, stated:

"It is quite true that an insurance company is entitled to a reasonable time within which to investigate and to act upon an application and that, if death occurs before it has acted

and before the expiration of that reasonable period, no liability results. But when that reasonable period expires—and what is a reasonable period must depend upon the facts in each case—and it fails to communicate its rejection to the applicant and also fails to return the amount conditionally paid with the application, surely the applicant, for a time at least, may assume that his application has been accepted and that shortly his policy will make its appearance. Just how long he may rely upon this assumption is a matter which also must be determined by the facts of each case. An ignorant laborer, having no knowledge of the insurance business, may, for a considerable time, assume, from the retention of his premium and the failure to communicate rejection of his application, that the application has been approved and that the policy will be forthcoming. We recognize, of course, that sooner or later, if no policy is received, the applicant may be under the duty to inquire and to investigate to ascertain why he has not received it, and, after the lapse of too long a time, it may be that it would be proper to say that his own failure to investigate should be held to be negligence on his part. But, as we have said, if the company retains his money and fails to advise him that it has rejected the application, he may, for a reasonable period, rely upon those facts, and, acting upon that reliance, fail to attempt to place his insurance elsewhere. If he does so rely and a loss occurs, it may properly be said that the fact that he has made no other attempt to secure insurance is properly chargeable to the negligence of the company in failing to communicate to him the facts which—had he known them—would have prompted him to secure insurance elsewhere."

We have been unable to find any decision of this Court passing upon the precise question which has been discussed. However, it was stated in *Keller v. Provident Life & Accident Ins. Co., supra*: "Upon the filing of an application, it is the duty of the insurer to act upon it with reasonable promptness and, in the meantime, to refrain from doing anything reasonably calculated to mislead the applicant."

Without undertaking to formulate any general rule as to the circumstances under which liability may arise on account of the negligent delay in acting on an application for insurance, or on account of the failure within a reasonable time to refund the premium and notify the applicant that his application has been rejected, it is our view that the facts in this case are sufficient to sustain liability on the theory of an implied acceptance of the application. Here there is more than a mere delay in failing within a reasonable time to notify the applicant that his application was rejected. After such alleged rejection, appellant through its agent assumed an attitude wholly inconsistent with that fact. It continued for a long period of time to retain the premium deposit and two or three weeks prior to the death of the applicant, the agent, when advised by respondent that her husband wished to take out insurance elsewhere if the application was not going through, stated that he would let her know "in a few days". Surely under these circumstances, after hearing nothing further from the company for a period of two weeks, an acceptance could be reasonably implied.

We are further of the opinion that the facts of this case are sufficient to reasonably warrant the conclusion that appellant by its conduct is estopped to assert that there was no contract of insurance. Some authorities hold that estoppel can never create a right although it may be urged for the protection of a right. We have held that the doctrine of waiver "cannot be successfully invoked to create a primary liability, or a liability for a benefit not contracted for at all." *Hodge v. National Fidelity Insurance Co.,* 221 S. C. 33, 68 S. E. (2d) 636, 640. But we have not gone that far with reference to estoppel. In *Ellis v. Metropolitan Casualty Insurance Co. of New York,* 187 S. C. 162, 197 S. E. 510, it was held that where elements of estoppel exist, an insurer may be precluded from asserting that a loss was not within the terms of the policy.

Assuming, as appellant contends, that respondent was not misled into believing that the policy had been issued, there is abundant evidence to show that she was misled into believing that the application was still being considered, although appellant now says that the application was promptly rejected. Under these circumstances, respondent's husband would naturally not apply for the same insurance in some other company until informed of the action which appellant had taken. During all of this period of approximately three months, the applicant was deprived of the use of his deposit. The fact that the amount was exceedingly small does not affect the principle involved.

It is true that the breach of duty in this case may have been that of the agent in failing to carry out the directions of appellant to notify respondent of the rejection and refund the premium deposit, but this does not change the result. The company selected this agent and cannot be heard to complain that he did not carry out its instructions.

Finally, it is suggested that if respondent has any cause of action, it is in tort and not *ex contractu*. Assuming, as a number of cases hold, that respondent could have maintained an action *ex delicto,* we think under the facts of this case she also had a right to bring an action in contract. It has been so held. *Harding v. Metropolitan Life Ins. Co., supra.* La. App., 188 So. 177; *American Life Insurance Company of Alabama v. Hutcheson, supra,* 6 Cir., 109 F. (2d) 424; *Reck v. Prudential Insurance Company of America, supra,* 116 N. J. L. 444, 184 A. 777; *Dyer v. Missouri State Life Ins. Co.,* 132 Wash. 378, 232 P. 346. In *American Life Insurance Company of Alabama v. Hutcheson, supra,* the Court, in answering a contention that an action *ex contractu* could not be maintained, said: "In the instant case the appellant solicited the applicant, and if the applicant was not notified of rejection within a reasonable time, under the rule of the cited case, acceptance is implied, and a contract exists, so that appellant's contention that ap-

pellee should have grounded this action in tort instead of in contract is untenable."

It may not be amiss to state that it is doubtful whether appellant was prejudiced by the form of action, for in those jurisdictions permitting tort actions, the legal consequences seem to be the same. In the recent case of *Man v. Policy-holders' Nat. Life Ins. Co.*, N. D., 51 N. W. (2d) 853, 865, the Court said: "The next assignment of error on the motion for a new trial is that the jury gave excessive damages under the influence of passion and prejudice. Defendant contends that the evidence at the most justified only a return of the premium paid. There is no merit to that assignment. If there was evidence to warrant holding the defendant negligent in failing to act on the application, it necessarily was liable for the loss suffered by the plaintiff which was the amount of the insurance applied for."

For the foregoing reasons, we think the motions for nonsuit, directed verdict and judgment *non obstante veredicto* were properly denied.

The only other question raised by the exception relates to the charge. It is contended that the Court erred in charging the jury as follows:

"I charge you, Mr. Foreman and Gentlemen, that the mailing of a policy of insurance to the general agent of the insurer is a constructive delivery of the policy, if the other terms and conditions of the contract are met, and it was mailed to the agent with the intention that it would be delivered."

Appellant says: "Though the charge was correct as an abstract statement of law, it was error to so charge in this case, because there was no evidence showing or tending to show that a policy of insurance had been mailed or even issued on the application."

It is true that there is no evidence that a policy was ever issued or mailed to the general agent, but appellant is not in position to complain of this instruction because during

the trial of the case its counsel stated that it was a question for the jury as to whether or not the policy had been issued. This is shown by the following colloquy between appellant's counsel and the Court occurring at the conclusion of the charge:

"Mr. Mays: Your Honor, in the matter of denying acceptance I think you should charge the jury that the defendant was not required to deny anything until something has been proven by plaintiff to be denied. As to whether or not the policy was issued, that is a question for the jury to find.

"The Court: I think I have stated that."

All exceptions are overruled and the judgment below affirmed.

FISHBURNE and STUKES, JJ., concur.

BAKER, C. J., and TAYLOR, J., dissent.

BAKER, Chief Justice (dissenting).

This is an action upon an alleged policy of accident insurance on the life of respondent's husband in the sum of $1,000.00, the issuance of which is denied by the appellant.

A trial of the case in the Circuit Court resulted in a verdict for the respondent for the sum mentioned. Judgment in accord was duly entered, and this appeal followed.

At the close of respondent's presentation of evidence, the appellant made a motion for a nonsuit, which was denied. At the close of all of the evidence the appellant made a motion for a direction of verdict in its behalf, and this motion was refused. After the verdict was published, the appellant made a motion for judgment *non obstante veredicto* which was likewise refused. The appeal is from the rulings of the Court on these motions and the judgment entered.

On March 3, 1951, the respondent submitted to the appellant two applications for accident insurance; one on her own life, the other on the life of her husband James B. Moore, she being the beneficiary named in the application for the accident policy on the life of her said husband. These

applications were received by an agent of the appellant, accompanied with a deposit of 20¢ made on each, and on the understanding as stated in the receipt therefor, that the deposit would be returned if the applications were not approved by the appellant company. Five weeks later, an agent of the appellant, while collecting from the respondent on some other insurance she already had with it, delivered to respondent the accident policy on her life and collected the accrued premiums thereon, and told her that he had not heard anything from her husband's policy (the policy here involved), and that he was not sure whether it would go through or not; that "we just wrote worlds of them and haven't had time to get them back." The respondent then and there asked the agent "did he want to just put that (the 20¢ paid when the application was made) on my premium or let it stand. He said let it stand and in a few days he'd see." The next time respondent saw the agent was five weeks thereafter. She again asked him if her husband's policy had come in, and he replied that it hadn't. She then asked him if he wanted to put it (the 20¢) on her premium, and he replied, "Let it stand. There was some policies came in. I'm pretty sure it might have come in that bunch." Respondent told the agent her husband had said "that if it wasn't going through, he wanted to take out the insurance with another company." The agent replied, "I'll let you know in a few days."

It was on Saturday morning following the Monday morning when her husband was buried that respondent again saw an agent of appellant company. Her husband was killed in an accident on June 3rd, three months after the application for the accident insurance and approximately two weeks after her last conversation with appellant's agent detailed in the preceding paragraph. On this Saturday morning when an agent of the appellant came to respondent's home for the purpose of collecting premiums on her policies, she did not see the agent, but communicated with him through her niece who went to the door. We here quote from the record.

"A. * * * She came into the house and told me and I gave her the money. I told her that before you say anything to him about his being dead, unless he mentions it to you about the policy, first, you ask him did he bring the policy before you tell him he is dead. She went back and asked him. He told her to tell me that Mr. Newell wasn't with the company any more, the man that wrote the policy. He would have the manager to come to see me about it Monday morning.

"Q. What happened then? A. Instead of waiting until Monday morning, he left and was gone about 30 minutes and comes flying in there with a statement saying my husband was turned down because of being a truck driver at the time he took that out.

"I had not been told at any time between the filing of the application on March 3 and the death of my husband three months later on June 3 that my application for a policy on his life was turned down."

The testimony of the respondent on cross-examination in question and answer form follows:

"Q. Mrs. Moore, this is the application I believe you said bears the name of James B. Moore, which you wrote with the authority of your husband? (Indicating.) A. That's right.

"Q. 'Such policy, if issued, to become effective * * *' (Reading from application).

"Q. You understood, of course, in handing this in that he wouldn't be insured until the company passed upon it? A. That is what I have always thought.

"Q. This is the receipt which Mr. Newell gave you in return for the 20¢? A. Yes, sir, that is the receipt.

"Q. Which reads, 'Received of Moore,' that is meaning you, 'the sum of 20¢. The same to become a deposit of 20¢ on account of application for policy with the Palmetto State Life Insurance Company. It is understood that it will be returned in the event the policy is not issued—'

"Q. Did you understand it that way? A. Yes, I did.

"Q. At the time you applied for a policy yourself? A. I did.

"Q. After five weeks Mr. Newell came to your house and delivered your policy? A. Yes, sir, he did."

On redirect examination, respondent testified that when the agent of the appellant, after talking to her niece at the door, came back that day he informed her that the application of her husband had been rejected and offered to refund to her the 20¢ she had paid when she applied for the insurance, but that she declined to accept it.

The application for the insurance provided that the policy "if issued" would become effective as of the date of the policy; and the occupation of the proposed insured was stated therein as "long hauling truck driver." This application was sent to the Home Office of the appellant in Columbia and in due course considered by its Underwriting Department and declined on March 19, 1951, because of the hazardous occupation of the applicant. According to the custom of the appellant company, the Home Office on the same day sent to the District Manager at Anderson, the office from which the application was received, information on a company form showing that the application had been declined because of the occupational hazard. It was the duty of the agent who had received the application to have advised the respondent that it had been declined, and return to her the sum of 20¢ deposited with the application. In fact, as aforestated, the receipt which was issued for the 20¢ when it was paid stated that the deposit would be returned if the application was not approved by the appellant company. Appellant company does not write accident insurance policies on "long hauling truck drivers" or "transport truck drivers."

There is a conflict in the testimony as to the conversation between respondent and the agent of appellant, and some other minor matters, but in the light of the issues in this appeal, we necessarily accept the respondent's version of the matter.

The complaint of the respondent alleges on information and belief that pursuant to an application, appellant issued a policy on the life of her husband and the delivery thereof was negligently delayed in its office, but that even in the absence of an issuance of an actual policy, the appellant should be estopped to deny the issuance of the policy. The answer for a first defense pleaded a general denial; and for a second defense made allegations substantially in accord with the facts as set out hereinabove immediately following the summary of respondent's testimony. Therefore, in the view we take of this case, the only questions to which we will direct our attention are:

(1) Did the trial Judge err in submitting to the jury the issue (if there is such issue) whether a policy of insurance was issued by the appellant on the life of respondent's husband, and (2) Did he err in submitting to the jury the issue of whether appellant should be estopped to deny the issuance of a policy of insurance on the life of respondent's husband.

The uncontradicted testimony of the underwriter and manager of the Weekly Premium Department of the appellant company, supported by his office records, shows that the policy was not issued, and to the contrary was declined, and notice thereof sent from the Home Office in Columbia to the District Manager at Anderson, the office of appellant where the application originated.

There is not a scintilla of testimony that the appellant ever approved the application for this insurance and that a policy was ever issued.

We now come to the second issue, that is, under the facts of this case and the governing law, is the appellant estopped to deny the issuance of the policy.

In *Palmer v. Sovereign Camp, W. O. W.,* 197 S. C. 379, 391, 15 S. E. (2d) 655, 661, it is stated: "The principle of estoppel in equity stands upon the very foundations of right and fair dealing. It considers and weighs the conduct

of men in their dealings with each other, and gives that effect and meaning to their actions which common sense and justice dictate."

A succinct statement of the law governing equitable estoppel is contained in *Baker v. Mutual Loan & Investment Co.,* 218 S. C. 47, 55, 61 S. E. (2d) 387, 390, as follows:

"Ordinarily, to constitute estoppel, there must be conduct, acts, language or silence amounting to a representation or concealment of facts, and the party claiming the estoppel must have acted upon it, and thereby changed his position for the worse. *Cannon v. Baker,* 97 S. C. 116, 81 S. E. 478."

In his order refusing the motion for judgment *non obstante veredicto,* the trial Judge cites *Keller v. Provident Life & Accident Ins. Co.,* 213 S. C. 339, 49 S. E. (2d) 577, and *McGrath v. Piedmont Mutual Ins. Co.,* 74 S. C. 69, 54 S. E. 218, on the principle of estoppel. The facts of these cases are so different from the facts of the case under discussion that they cannot be considered as authority. However, the principles of law in reference to estoppel laid down in these cases are apposite here; and we quote from the *Keller case,* which in part states the identical principle as that stated in the *McGrath case.*

"An application for life insurance is a mere offer or proposal and, until accepted, no contractual relationship exists between the applicant and the insurance company. The mere mailing and filing of such application can never be deemed an acceptance. 'Something more is necessary to be shown, either an actual acceptance, or such circumstances as may imply acceptance, or estoppel from denying acceptance.' *McGrath v. Piedmont Mutual Insurance Co.,* 74 S. C. 69, 54 S. E. 218, 220. 'A mere intention or mental determination on the part of the insurer to accept the application is not of itself sufficient to effect a binding contract.' 29 Am. Jur., page 155. 'There must be some outward manifestation' of its assent. *Bowman v. Northern Accident Co.,* 124 Mo. App. 477, 101 S. W. 691. Acceptance must be signified by some

act from which the insurer cannot recede without liability. Upon the filing of an application, it is the duty of the insurer to act upon it with reasonable promptness and, in the meantime, to refrain from doing anything reasonably calculated to mislead the applicant." [213 S. C. 339, 49 S. E. (2d) 582.]

The delay in giving notice to the respondent of the rejection of the application for the insurance did not create a presumption that the application had been favorably passed upon, when, as here, the respondent could not have believed, and she did not so testify, that it had been favorably passed upon and that a policy had been issued. We quote from 29 Am. Jur., Insurance, Section 141, as follows: "It is a well-settled rule, established by the great weight of authority, that mere delay in passing upon an application for insurance cannot be construed as an acceptance thereof by the insurer which will support an action *ex contractu.*" And from 19 Am. Jur., Estoppel, from Section 83: "It is essential to the existence of an equitable estoppel that the representation, whether consisting of words, acts, or omissions, of the party against whom the estoppel is asserted shall have been believed by the party claiming the benefit thereof and that he shall have relied thereon and been influenced and misled thereby." And from same volume and subject, from Section 84: "Not only must the party claiming an estoppel have believed and relied upon the words or conduct of the other party, but also he must have been thereby induced to act, or to refrain from acting, in such a manner and to such an extent as to change his position or status from that which he would otherwise have occupied."

Respondent knew that the receipt for the 20¢ deposit did not bind the appellant company to insure her husband's life and, with commendable frankness, admitted that she understood that the policy would not be issued unless the application for the insurance was approved. Recapitulating, five weeks after the applications were sent in, and when her accident policy was being delivered to her, she inquired of appel-

lant's agent if her husband's policy had come in and was told that nothing had been heard therefrom and that he wasn't sure whether it would go through or not. She then inquired if he wanted to apply the 20¢ deposit on her premiums or let it stand, and she acquiesced in his proposal to "let it stand." Five weeks later, when the agent of appellant was at her home for the purposes of collecting the premiums on her policies, she inquired if her husband's policy had come in, and was informed that it hadn't. She then, for the second time, suggested that the 20¢ be applied on her premiums, but when the agent again recommended that she let it stand, stating that some policies had come in and he was "pretty sure it might have come in that bunch," and that he would let her "know in a few days," she acquiesced.

Respondent did not again see or hear from the agent until he came around to collect premiums on her policies approximately one week after the death of her husband on June 3rd, and what took place at that time has hereinbefore been quoted from the record. Although the agent of the appellant did not notify the respondent that the issuance of a policy on this application had definitely been declined until after the death of her husband, we think it is obvious from the record that respondent did not believe that a policy had been issued, but had kept in her mind the possibility, even the hope, that one would be issued. The statements of the agent of appellant to her, intelligent woman she appears to be, could not have caused her to believe that the policy had been issued. As stated by appellant's counsel in their printed brief, the ultimate issue is not whether the agent tried to mislead the respondent, but whether she was actually misled —not into believing that her policy might be issued, but into believing that her policy had been issued. The fact that her husband might have applied elsewhere for insurance and might possibly have gotten it, does not justify a suit on a policy never issued. Respondent and her husband had the right to apply to another insurance company for insurance at any time and, viewing the testimony in the light most

favorable to respondent, we can reach no other conclusion than that she, at most, could only have hoped that the policy had been issued. Whether any other insurance company would have written insurance on respondent's husband if she had applied therefor, is, of course, problematical.

This being an action *ex contractu*, the trial Judge erred in refusing appellant's motion for a direction of verdict.

The foregoing was written as and for the opinion of the Court, but the dissenting opinion of Mr. Justice Oxner having become the prevailing opinion, it is filed as a dissent.

We are in accord with the cited law in the majority opinion, but, with all deference, we think it obvious that such law is not applicable to the facts of this case.

Even though the facts of this case may support an action in tort, and the damages would be the same, yet such damages would have to be recovered in a proper action, to wit, an action in tort and not on contract.

Judgment appealed from should be reversed, and the case remanded for entry of judgment in favor of the appellant.

TAYLOR, J., concurs.